Becky and David Litowitz, while married, contracted with an egg donor and an in vitro fertilization (IVF) clinic in an effort to produce a child, or children. David's sperm fertilized five donated eggs, which began cell division; three of these five "preembryos"[1] were implanted in a surrogate mother while the other two were cryopreserved.[2] The surrogate bore the Litowitz's child, Micah. By the time Micah was born, however, Becky and David had separated.
In the dissolution, Becky wanted the preembryos awarded to her for implanting in a surrogate, with the intent that Becky would be the primary residential parent for any resulting child. But the trial judge awarded the preembryos to David, who wanted to place the preembryos with an out-of-state couple. On appeal, Becky argues that the trial judge erred in applying a best-interests-of-the-child standard to the preembryos. Becky also argues that the trial court should have enforced the egg donor contract, which, according to Becky, compels an award of the preembryos to her. *Page 936 
We agree that the trial court erred in considering only the best interests of any child resulting from the preembryos. But we affirm, holding that David is not bound by contract to become a parent. Further, because David is the only progenitor before this court, he has the right to control the destiny of the preembryos. We affirm the award of the preembryos to David.
 FACTS
Becky is the biological mother of Ann Marie (age 24) and Lucas (age 22). David adopted both of these children. Becky and David had one child together, Jacob, born in 1980. After Jacob's birth, Becky had a hysterectomy and was unable to give birth naturally or to be an egg donor.
Becky and David married in 1982 and wanted to have at least one more child together. After seeking help at the University of Washington, the Litowitzes were referred to the Center for Surrogate Parenting in California.[3] In California, Becky and David contracted with an egg donor.
The egg donor contract, signed in California, is between the "intended parents" (David, the natural father, and Becky, the intended mother) and the egg donor and her husband. The "intended parents" are described as a "married couple" who intend to utilize the donated eggs and David's sperm to carry "a pregnancy to term through third party assisted reproduction." Any children were to be the children of the "intended parents." And under the egg donor contract, "child" includes "all children born pursuant to the terms and provisions of this Agreement, provided the *Page 937 
parentage of the Child is determined pursuant to the terms of this agreement."[4] The contract also provided:
 All eggs produced by the Egg Donor pursuant to this Agreement shall be deemed the property of the Intended Parents and as such, the Intended Parents shall have the sole right to determine the disposition of said egg(s). In no event may the Intended Parents allow any other party the use of said eggs without express written permission of the Egg Donor.
Before beginning the IVF procedures, Becky and David entered into additional agreements with the Loma Linda University Gynecology 
Obstetrics Medical Group, Inc. (the clinic). These agreements included consent for short term cryopreservation of David's sperm and consent for the cryopreservation of preembryos following IVF. Under a section entitled "Legal Status and Disposition Choices," the informed consent for freezing the preembryos provided:
 We agree that because both the husband and wife are participants in the cryopreservation program, that any decision regarding the disposition of our [preembryos] will be made by mutual consent. In the event we are unable to reach a mutual decision regarding the disposition of our [preembryos], we must petition to a Court of competent jurisdiction for instructions concerning the appropriate disposition of our [preembryos].
 (Emphasis added.)
The Litowitzes also agreed that under certain circumstances (e.g., death of both), any unused frozen preembryos would be thawed and not allowed to develop. But none of the listed circumstances included a marriage dissolution.
The donated eggs were then fertilized with David's sperm, producing five preembryos. Two of the preembryos were cryogenically frozen[5] and three of them were *Page 938 
implanted in a surrogate.[6] The IVF and surrogacy resulted in the birth of Micah, now three years old. By a California court order, the Litowitzes were declared the legal parents of Micah before she was born.
By the time Micah was born in January 1997, Becky and David had separated. At trial, Becky asked that the preembryos be awarded to her under the terms of the egg donor contract. During opening argument, David's attorney said that David was "strongly opposed to bringing [the preembryos] to life." On direct examination, however, David stated that he preferred that the preembryos be put "up for adoption."[7]
The trial court ruled orally, awarding the preembryos to David, "with orders to use his absolute best effort for adoption to a two-person family outside of the state of Washington and, obviously, considering the donor in that, as . . . required." The ruling was later reduced to a court order.[8] The trial court applied a best-interests-of-the-child analysis in reaching its decision: "My decision on the preembryo has very little to do with property, very little to do with constitutional rights, everything to do with the benefit of the child." *Page 939 
Becky moved for reconsideration, incorporating the following declaration from the egg donor:[9]
 In the event that the court fails to award the [preembryos] to [Becky], I insist that the court award the [preembryos] to me or return the eggs to me in accordance with the contract.
The trial court denied the motion for reconsideration.
 ANALYSIS
A. Express and Implied Contracts
Becky argues that the egg donor contract should be enforced, reasoning that she, as one of the "intended parents," should be allowed to continue the procreation process. In a variation of her contract theme, Becky also argues that David should be estopped from donating the preembryos because both she and the egg donor relied upon the agreement that only the Litowitzes would use the preembryos. Becky relies, in part, on Kass v.Kass, 696 N.E.2d 174 (N.Y. 1998).
Four jurisdictions have addressed the question of whether a contract addressing preembryo disposition is enforceable. Davis v. Davis,842 S.W.2d 588 (Tenn. 1992), cert. denied, sub nom. Stowe v. Davis,507 U.S. 911 (1993); Kass, 696 N.E.2d 174; A.Z. v. B.Z., 725 N.E.2d 1051
(Mass. 2000); J.B. v. M.B., 751 A.2d 613 (N.J. Super. Ct. App. Div. 200 0). In Davis, the parties had no written agreement but the court, in dicta, noted that such contracts should be enforced. Davis, 842 S.W.2d at 597. This dicta was cited with approval by the Kass court, which held that the parties' express contract controls the disposition of the preembryos. Kass, 696 N.E.2d at 180, 182. In A.Z., the court held that even though there was an agreement between the husband and wife progenitors specifying that if they separate, the preembryos were to be given to the wife for implantation, such an agreement was unenforceable in part *Page 940 
because the parties were separated, i.e., divorced. A.Z., 725 N.E.2d at 1057. Further, the A.Z. court stated that as a matter of public policy, "we would not enforce an agreement that would compel one donor to become a parent against his or her will." A.Z., 725 N.E.2d at 1057. Most recently, the J.B. court also held that a "contract to procreate is contrary to New Jersey public policy and is unenforceable." J.B., 751 A.2d at 619.
Becky argues that the parties had an express agreement with the egg donor, which, following Kass, should be enforced. In Kass, the husband and wife signed four consent forms. One form stated: "In the event of divorce, we understand that legal ownership of any stored pre-zygotes must be determined in a property settlement and will be released as directed by order of a court of competent jurisdiction;" and "[t]he possibility of our death or any other unforeseen circumstances that may result in neither of us being able to determine the disposition of any stored frozen pre-zygotes requires that we now indicate our wishes."[10]Kass, 696 N.E.2d at 176. But, an addendum to the cryopreservation consent form provided that if the husband and wife were "unable to make a decision regarding the disposition of our stored, frozen pre-zygotes . . . [they may] be disposed of by the IVF Program." Kass, 696 N.E.2d at 176-77. After originally agreeing in the divorce action that the pre-zygotes be disposed of as provided in the consent form, the wife changed her mind and asked that the pre-zygotes be awarded to her for implantation. Kass, 696 N.E.2d at 177.
The New York court held that "[a]greements between progenitors, or gamete donors, regarding disposition of *Page 941 
their pre-zygotes should generally be presumed valid and binding."Kass, 696 N.E.2d at 180. The question was whether the agreements were too ambiguous to be enforced. The court concluded that they were not, noting the consistent theme of the documents that disposition of the pre-zygotes was to be a joint decision. The court rejected the wife's argument that the "in the event of divorce" language required a court's decision.[11] Rather, this language required disposition by a property settlement. And the parties" inability to reach a settlement was an unforeseen circumstance that triggered the IVF donation language. Kass, 696 N.E.2d at 181-82.
Here, the egg donor contract, by its express terms, gives Becky and David, the intended parents, the "sole right to determine the disposition" of the eggs. But here, unlike in Kass, David and Becky's consent for cryopreservation does not say what should be done with the preembryos if the parties cannot agree or if they dissolve their marriage. The consent form provides only that, "[i]n the event we are unable to reach a mutual decision regarding the disposition of our pre-embryos, we must petition to a Court of competent jurisdiction for instructions concerning the appropriate disposition of our pre-embryos." Thus, there is no express agreement to enforce.
Becky, in effect, asks us to imply a provision that the parties planned to parent another child, that this provision survived the dissolution, and that she should be awarded the preembryos to carry out this plan. A similar argument was rejected in Davis, the court noting that there was no evidence that the husband intended to use the preembryos for reproduction outside the marital relationship. Davis v. Davis,842 S.W.2d 588, 598 (Tenn. 1992). We agree with this Tennessee court. Absent any evidence that David "intended to pursue reproduction outside the . . . marital *Page 942 
relationship" with Becky, we are unwilling to create such an obligation.Davis, 842 S.W.2d at 598. Furthermore, at least one court, because of public policy concerns, has said it would not enforce even an unambiguous agreement "that would compel one donor to become a parent against his or her will." A.Z., 725 N.E.2d at 1057; see also J.B., 751 A.2d at 619 (agreeing with reasoning in A.Z.). Although we need not decide whether such an unambiguous contract would be against public policy in Washington, we agree that judicial intrusion into this most personal aspect of life should be done with great caution. Accordingly, we will not read into the contracts an implied promise that David would continue with the parties' family planning after the dissolution.
Becky also contends that David should be estopped from changing his position from the time the egg donor contract was signed and the procreation process began. Becky relies on In re Marriage of Buzzanca,61 Cal.App.4th 1410, 72 Cal.Rptr.2d 280 (1998). The Buzzancas agreed to have a genetically unrelated child using artificial reproduction technology. Buzzanca, 72 Cal.Rptr.2d at 282. After the surrogate became pregnant, the Buzzancas divorced. Buzzanca, 72 Cal.Rptr.2d at 282. In holding both parties to be the legal parents of the child, the court discussed estopping a party from "consenting to an act which brings a child into existence and then turning around and disclaiming any responsibility." Buzzanca, 72 Cal.Rptr.2d at 287. Buzzanca is not helpful, however, because it concerned a child already born, not a preembryo.
Moreover, this argument again assumes a continuing obligation by David to follow the family plan the parties made when married. As we have discussed, the contract documents do not contain such an express promise and we are not willing to imply one.
B. Constitutional Issues and Basis of Award to David
In 1992, the Supreme Court of Tennessee held that because the constitutional rights of the parties, also the gamete donors, were in conflict, their interests must be *Page 943 
weighed. Davis, 842 S.W.2d at 603. By the time the Davis case was before the Tennessee Supreme Court, both parties had remarried. Davis, 842 S.W.2d at 590. The wife, Mary Sue, wanted to donate the frozen preembryos to a childless couple while the husband, Junior, wanted the preembryos to be discarded.[12] Davis, 842 S.W.2d at 590.
Because the Davis court found that the "essential dispute . . . [is] whether the parties will become parents," it considered the parties' constitutional right to privacy. Davis, 842 S.W.2d at 598. The court held that under both the United States and Tennesee constitutions, the right of procreation was a vital part of the right of privacy. Davis, 842 S.W.2d at 600. Specifically, the parties enjoyed procreational autonomy, which included "the right to procreate and the right to avoid procreation."Davis, 842 S.W.2d at 601, 603. But the court limited these procreation rights to the "gamete-providers alone." Davis, 842 S.W.2d at 602. The court, however, recognized that the "interests of these parties in parenthood are different in scope than the parental interest considered in other cases." Davis, 842 S.W.2d at 602-03. The interest of the parties lies in "genetic parenthood." Davis, 842 S.W.2d at 603.
Because Mary Sue and Junior's constitutional rights were in conflict, the court balanced the interests of the parties. Davis, 842 S.W.2d at 603-04. If the preembryos developed into children, then unwanted parenthood was imposed on Junior. Davis, 842 S.W.2d at 603. And, because of childhood experiences as a child of divorced parents, Junior was "vehemently opposed to fathering a child that would not live with both parents." Davis, 842 S.W.2d at 604. Mary Sue's interest, which included enduring the IVF procedures, would result in a positive outcome for some childless couple. But this was held to be less significant than Junior's interest. Davis, 842 S.W.2d at 604. The Davis court opined that "[t]he case would be closer if Mary Sue Davis were seeking to use the preembryos herself, but only *Page 944 
if she could not achieve parenthood by any other reasonable means." Davis, 842 S.W.2d at 604. The court further stated: "Ordinarily, the party wishing to avoid procreation should prevail, assuming that the other party has a reasonable possibility of achieving parenthood by means other than use of the preembryos in question." Davis, 842 S.W.2d at 604.
Here, Becky did not contribute any gametes to the preembryos. Thus, under a Davis analysis, she does not have a constitutional right to procreate. But David is a progenitor and, therefore, he has a constitutional right not to procreate.
Arguably, however, David is not invoking his right not to procreate because, although he does not want to parent any child from these preembryos, he is willing to allow the preembryos to develop if others parent any resulting children. At least one court has said that parenting rights, although they might be constitutionally protected, are not a part of procreation rights. In re the Matter of Baby M, 537 A.2d 1227, 1253-54 (N.J. 1988). But Baby M was a custody battle over a child, and the argument was that the natural father's right to procreate prevailed over the natural mother's right to custody of the baby.
Here, we have preembryos, not a child. If any of the preembryos becomes a child in a setting where David has contact with the child, he will be thrust into a lifetime parenting role. And if David has the right to control whether the preembryos continue on to life, he can surely exercise this right for the purpose of avoiding parenthood. Moreover, in discussing Junior's right not to procreate, the Davis court was unwilling to "impose unwanted parenthood on [Junior], with all of its possible financial and psychological consequences." Davis, 842 S.W.2d at 603 (emphasis added). But the financial and psychological consequences flow from the long-term obligations of parenting, not the brief act of procreating. We hold that under these circumstances, David can exercise his right not to procreate in a limited way that allows the preembryos to develop but avoids placing him in the unwanted parenting role. *Page 945 
C. Egg Donor's Interest
Becky argues that the trial court erred in failing to determine the applicable California law. This, according to Becky, has exposed her to potential liability to the egg donor because the donor contract provides in part:
 All eggs produced by the Egg Donor pursuant to this Agreement shall be deemed the property of the Intended Parents and as such, the Intended Parents shall have the sole right to determine the disposition of said egg(s). In no event may the Intended Parents allow any other party the use of said eggs without express written permission of the Egg Donor.
And the egg donor's declaration, included by Becky in her motion for reconsideration, states:
 In the event that the court fails to award the [preembryos] to [Becky], I insist that the court award the [preembryos] to me or return the eggs to me in accordance with the contract.
Becky misreads the contract provision. The language does not prevent David from donating the preembryos to another couple. At most, it prevents him from doing so without the written permission of the egg donor. Thus, if David successfully locates a donee couple, he may need permission from the egg donor to complete the preembryo transfer. But David may not need the egg donor's permission. The contract provision deals with ownership and disposition of the eggs. The eggs, however, no longer exist. They have been fertilized and are now preembryos. Thus, the egg donor's request that the "eggs" be returned to her, even if properly before the court,[13] cannot be met. And nothing in the contract controls disposition of the preembryos or requires the egg donor's consent to disposition of the preembryos. In any event, the issue is premature. David has not located a prospective donee couple for the preembryos or sought to transfer them without the egg donor's consent. *Page 946 
D. Practical Effect of Decision
Becky contends that the trial court erred by failing to determine whether David's plan for "adopting out" the preembryos was feasible and would "provide finality to the issue." Becky criticizes David's position for lacking an "informed opinion as to the viability of the preembryos."
But David has the constitutional right to dispose of the preembryos as he chooses. He is not obligated to formulate a feasible plan or even a plan that would potentially bring the preembryos to life.[14]
In conclusion, we hold that the contracts signed by the Litowitzes do not require, either by express or implied terms, that David continue with the parties' family plan after the dissolution. And David's right not to procreate compels an award of the preembryos to him. We affirm.
HUNT, J., concurs.
[1] The term "preembryo" is used in most court opinions. See Marla Clark, Potential Parenthood: The Ownership of Frozen Embryos, RES GESTAE, Nov. 1999, at 24, 30 fn. 10. It is also the term used by the American Fertility Society. Tanya Feliciano, Davis v. Davis: What AboutFuture Disputes? 26 CONN. L. REV. 305, 309 (1993). Fertilization takes several hours as the twenty-four chromosomes of each gamete (egg and sperm) fuse, yielding a zygote with a unique genome of forty-eight chromosomes. The zygote is then allowed to divide for about three days, until it reaches the two to eight-cell stage. These preembryos, consisting of a few undifferentiated cells, are either implanted or cryopreserved for implantation at a later date. It is not until the cell mass proceeds beyond sixteen cells and implants that it can give rise to an embryo. John A. Robertson, In the Beginning: The Legal Status ofEarly Embryos, 76 VA. L. REV. 437, 441-43 (1990). Where a court used a term other than preembryo, this opinion uses the term chosen by each state's highest court when discussing that state's case law.
[2] Cryopreservation is the freezing of tissue or cells in liquid nitrogen at negative 195 degrees centigrade. See Lee Kuo, LessonsLearned from Great Britain's Human Fertilization and Embryology Act:Should the United States Regulate the Fate of Unused Frozen Embryos? 19 LOY. L.A. INT'L COMP. L.J. 1027, 1030 (1997).
[3] Presumably, one reason the Litowitzes were referred to California was that Washington law prevents parties from contracting for surrogacy if the surrogate is to be compensated. RCW 26.26.230. "`Compensation' means a payment of money, objects, services, or anything else having monetary value except payment of expenses incurred as a result of the pregnancy and the actual medical expenses of a surrogate mother, and the payment of reasonable attorney fees for the drafting of a surrogate parentage contract." RCW 26.26.210(1). If the surrogate is compensated, the underlying contract cannot be enforced in Washington because it is void and contrary to public policy. RCW 26.26.240.
[4] It is unclear from the egg donor and IVF contracts how many children Becky and David intended to have by IVF.
[5] The practical storage life of preembryos may be five to ten years. Elizabeth Ann Pitrolo, The Birds, the Bees, and the Deep Freeze: IsThere International Consensus in the Debate Over Assisted ReproductiveTechnologies? 19 HOUS. J. INT'L L. 147, 154 (1996). One commentator states that the pregnancy rate after frozen preembryo implantation is about 8 to 12 percent; the actual birth rate is about 6 to 9 percent. Marla Clark, Potential Parenthood: The Ownership of Frozen Embryos, RES GESTAE, Nov. 1999, at 24. The CDC reports that, on a per transfer basis, 18.6 percent of frozen preembryos resulted in a live birth as opposed to a 29.7 percent live birth rate for fresh preembryos. U.S. Department of Health and Human Services Centers for Disease Control and Prevention, 1997 Assisted Reproductive Technology Success Rates (December 1999) http://www.cdc.gov/nccdphp/drh/art97. Because some cells will not survive the freezing or thawing process, the most viable preembryos are used first. Here, as Becky testified, the `healthiest ones [were selected] first.' Becky and the surrogate decided to implant only three of the five preembryos because they did not want to have to selectively reduce, or abort, any embryo(s), if more than three preembryos implanted during the first IVF cycle.
[6] The Litowitzes contracted with a surrogate and her husband for these services.
[7] The same GAL was appointed for Micah and subsequently for the frozen preembryos. When the GAL filed his parenting investigator's report, he recommended that Becky be allowed to use the preembryos, based on an American Bar Association (ABA) proposal that preferred the individual who wanted and pledged to bring the preembryos to life. The ABA subsequently rejected that proposal.
[8] Following this ruling, the court entered an order staying the preembryo award pending all appeals.
[9] This egg donor declaration is the only evidence of the donor's intent outside of the egg donor contract.
[10] The New York Court of Appeals adopted the parties' term "pre-zygotes.' Kass, 696 N.E.2d at 175, n. 1 (1998) ("We use the parties' term "pre-zygotes," which are defined in the record as 'eggs which have been penetrated by sperm but have not yet joined genetic material'"). Historically, this term also appears in York v. Jones, 717 F. Supp. 421
(E.D.Va. 1989). "Pre-zygote" is a misleading term. In both cases the subject matter was a fertilized egg that had undergone several cell divisions. Kass, 696 N.E.2d at 175; York, 717 F. Supp. at 423. The fusing of the twenty-four chromosomes from each gamete, to yield a zygote with forty-eight chromosomes, occurs before cell division. See John A. Robertson, In the Beginning: The Legal Status of Early Embryos, 76 VA. L. REV. 437, 441 (1990).
[11] The informed consent signed by the Kasses contained the following language: "In the event of divorce, we understand that legal ownership of any stored pre-zygotes must be determined in a property settlement and will be released as directed by order of a court of competent jurisdiction."Kass, 696 N.E.2d at 176.
[12] Neither Mary Sue nor Junior wanted to parent any child resulting from the preembryos. Davis, 842 S.W.2d at 590, 604.
[13] The egg donor is not a party to the Litowitz dissolution.
[14] David has not appealed the trial court's order that he use his best efforts to find adoptive parents for the preembryos.