[No. 70413-9.   En Banc.]
Argued September 11, 2001.     Decided June 13, 2002.

*In the Matter of the Marriage of* DAVID J. LITOWITZ,
*Respondent*, and BECKY M. LITOWITZ, *Petitioner*.

Colleen A. Grady, for petitioner.
Barton L. Adams (of Adams & Adams), for respondent.
Patricia S. Novotny on behalf of Northwest Women's Law Center, amicus curiae.

Smith, J. — Petitioner Becky M. Litowitz seeks review of a decision of the Court of Appeals, Division Two, which affirmed an order of the Pierce County Superior Court in favor of Respondent David J. Litowitz in a dissolution

action in which Respondent was awarded two cryopreserved[1] preembryos.[2] The Court of Appeals affirmed the trial court and awarded the preembryos to Respondent.[3] This court granted review. We reverse.

## QUESTIONS PRESENTED

The questions presented in this case are: (1) whether the Court of Appeals was correct when it affirmed a Superior Court award of two cryopreserved preembryos to Respondent David J. Litowitz in a parenting plan in a dissolution action and (2) whether a motion by Respondent David J. Litowitz to submit additional evidence on review should be granted.

## STATEMENT OF FACTS

On February 27, 1982 Petitioner Becky M. Litowitz and Respondent David J. Litowitz were married.[4] Respondent adopted Petitioner's two children from a previous mar-

---

[1] STEDMAN'S MEDICAL DICTIONARY 416 (26th ed. 1995) ("cryopreservation" is defined as the "[m]aintenance of the viability of excised tissues or organs at extremely low temperatures.").

*See* Lee Kuo, Note, *Lessons Learned from Great Britain's Human Fertilization and Embryology Act: Should the United States Regulate the Fate of Unused Frozen Embryos?*, 19 LOY. L.A. INT'L & COM. L.J. 1027, 1030-31 (1997) ("Cryopreservation is achieved by freezing the embryos in liquid nitrogen at negative 195 degrees centigrade. After freezing, the embryos are carefully stored and may later be thawed for implantation in a recipient's uterus."(footnote omitted)).

[2] Clerk's Papers at 177-78. "The term 'preembryo' denotes that stage in human development immediately after fertilization occurs. The preembryo 'comes into existence with the first cell division and lasts until the appearance of a single primitive streak, which is the first sign of organ differentiation. This [primitive streak] occurs at about fourteen days of development.'" Donna A. Katz, Note, *My Egg, Your Sperm, Whose Preembryo? A Proposal for Deciding Which Party Receives Custody of Frozen Preembryos*, 5 VA. J. SOC. POL'Y & L. 623, 628 n.42 (1998) (alteration in original) (quoting Clifford Grobstein, *Human Development from Fertilization to Birth, in* ENCYCLOPEDIA OF BIOETHICS 847 (Warren Thomas Reich ed., 1995)).

[3] *Litowitz v. Litowitz*, 102 Wn. App. 934, 10 P. 3d 1086 (2000).

[4] Clerk's Papers at 2.

riage.[5] On July 15, 1980, prior to their marriage, Petitioner and Respondent had a child together, Jacob Litowitz.[6] Shortly after Jacob was born Petitioner Litowitz had a hysterectomy leaving her unable to produce eggs or to naturally give birth to a child.[7]

Petitioner and Respondent decided to have another child through *in vitro* fertilization.[8] They sought the services of the Center for Surrogate Parenting, Loma Linda University Gynecology and Obstetrics Medical Group, in Loma Linda, California.[9] Five preembryos were created with eggs received from an egg donor.[10] The eggs were fertilized by Respondent Litowitz' sperm.[11] Three of the five preembryos were implanted in a surrogate mother, producing a female child, M., who was born January 25, 1997.[12] The two remaining preembryos were cryopreserved and stored in the clinic in Loma Linda, California.[13]

Petitioner and Respondent entered into a contract in Beverly Hills, California with the egg donor. The contract

---

[5] *Id.*

[6] *Id.* at 4.

[7] *Id.*

[8] STEDMAN'S MEDICAL DICTIONARY 637 (26th ed. 1995) ("*In vitro* fertilization *(IVF)*" is "a process whereby (usually multiple) ova are placed in a medium to which sperm are added for fertilization, the zygote thus produced then being introduced into the uterus and allowed to develop to term.").

*In vitro* fertilization "involves hormonal stimulation of the woman's ovaries, resulting in the ovulation of multiple eggs (frequently ten or more). The eggs are then removed via laparoscopy, a surgical procedure, or needle aspiration guided by ultrasound and are combined in a petri dish with either fresh or thawed sperm. The resulting 'preembryos' are allowed to divide until they reach the two- to eight-cell stage. Between one and six preembryos are inserted via catheter into the uterus, where it is hoped at least one will implant in the uterine wall and grow to full term." Katz, *supra* at 628-29 (footnotes omitted).

[9] 13 Report of Proceedings (Oct. 26, 1998) at 6.

[10] 11 Report of Proceedings (Oct. 21, 1998) at 51.

[11] *Id.*

[12] 11 Report of Proceedings (Oct. 21, 1998) at 51; 9 Report of Proceedings (Oct. 26, 1998); 13 Report of Proceedings (Oct. 26, 1998) at 13. The egg donor was not the surrogate mother.

[13] 11 Report of Proceedings (Oct. 21, 1998) at 54.

was signed by Petitioner Becky M. Litowitz on March 20, 1996, by Respondent David J. Litowitz on March 21, 1996[14] and by the egg donor, J.Y., and her husband, E.Y., on April 1, 1996.[15] The contract defined Petitioner as the "Intended Mother" and Respondent as the "Natural Father."[16] The "Intended Mother" and "Natural Father" are further defined as the "Intended Parents."[17] The egg donor contract provided in part:

## PARAGRAPH 13

All eggs produced by the Egg Donor pursuant to this Agreement shall be deemed the property of the Intended Parents and as such, the Intended Parents shall have the sole right to determine the disposition of said egg(s). In no event may the Intended Parents allow any other party the use of said eggs without express *written* permission of the Egg Donor.[18]

Respondent and Petitioner entered into two contracts with the Loma Linda Center for Fertility and In Vitro Fertilization in Loma Linda, California. One, a consent and authorization for preembryo cryopreservation (freezing) following *in vitro* fertilization, dated March 25, 1996, provided for freezing the preembryos.[19] The other was an agreement and consent for cryogenic preservation (short term), dated March 25, 1996.[20]

The consent and authorization for preembryo cryopreservation contract stated in part:

---

[14] *Clerk's Papers* at 159.

[15] Identity protection for the donor is required under the contract.

[16] *Id.*

[17] *Id.*

[18] *Id.* at 5.

[19] Answer to Pet. for Review, App. at 12-18. On one line Petitioner Becky M. Litowitz indicated next to her signature the date "3-26-95," although the date indicated by her and all other signators on the other lines was the year "96."

[20] Answer to Pet. for Review, App. at 17-18. The agreement was titled, "Agreement and Consent for Cryogenic Preservation (Short Term)". That contract is not relevant to the issues before the court in this case.

## LEGAL STATUS AND DISPOSITIONAL CHOICES

We have been advised and understand that the legal status of the frozen pre-embryos has not been fully determined. In this regard, we acknowledge that we have been advised to seek independent legal counsel concerning our respective rights with regard to each pre-embryo placed in cryopreservation. We agree that because both the husband and wife are participants in the cryopreservation program, that any decision regarding the disposition of our pre-embryos will be made by mutual consent. In the event we are unable to reach a mutual decision regarding the disposition of our pre-embryos, we must petition to a Court of competent jurisdiction for instructions concerning the appropriate disposition of our pre-embryos.

We are aware that for a variety of reason [sic], (e.g. our choice, death of both of us, our achieving our desired family size) one or more pre-embryos may remain frozen and will not be wanted or needed by us. *By this document, we wish to provide the Center with our mutual direction regarding disposition of our pre-embryos upon the occurrence of any one of the following four (4) events or dates:*

A. The death of the surviving spouse or in the event of our simultaneous death.

B. In the event we mutually withdraw our consent for participation in the cryopreservation program.

C. *Our pre-embryos have been maintained in cryopreservation for five (5) years after the initial date of cryopreservation unless the Center agrees, at our request, to extend our participation for an additional period of time.*

D. The Center ceases it's [sic] *in vitro* fertilization and cryopreservation program.

*At the earliest of the above-mentioned events or dates, we authorize and request that one of the following options be utilized for the disposition of our pre-embryos remaining in cryopreservation:*

(1) That our pre-embryos be donated to another infertile couple (who shall remain unknown to all parties concerned), selected by the attending physician and/or the medical director of the Program, in which case we would relinquish any and all claims of maternal and/or paternal rights to the donated pre-embryos;

    (2)  That our pre-embryos be donated for approved research and/or investigation;

    (3)  *That our pre-embryos be thawed but not allowed to undergo further development;*

    (4)  That our pre-embryos be disposed of in accordance with the best judgement [sic] of the professional staff of the Center.[21]

Petitioner and Respondent indicated their "desire for the ultimate disposition of [their] pre-embryos" by writing in longhand in the space provided on the contract "# 3—That our pre-embryos be thawed but not allowed to undergo further development."[22] Following that statement and the signatures of the Litowitzes, the contract stated, "We agree that this option selection is binding upon us until such time as it is changed, in writing, by our joint direction."[23]

Petitioner and Respondent separated before their daughter, M., was born.[24] In the dissolution proceedings in the Pierce County Superior Court, Respondent on October 21, 1998 indicated his wish to put the remaining preembryos up for adoption.[25] In those proceedings Petitioner on October 26, 1998 indicated her wish to implant the remaining preembryos in a surrogate mother and bring them to term.[26] On December 11, 1998 the trial court, the Honorable Waldo F. Stone, awarded the preembryos to Respondent David J. Litowitz based upon the "best interest of the child."[27] The order signed by Judge Stone provided in part:

DISPOSITION OF PREEMBRYOS: This court makes the following decision awarding the preembryos to father in the best interest of the child. If this child is brought into the world

---

[21] Answer to Pet. for Review, App. at 14-16 (emphasis added).

[22] *Id.*

[23] *Id.*

[24] 11 Report of Proceedings (Oct. 21, 1998) at 60.

[25] 11 Report of Proceedings (Oct. 21, 1998) at 55.

[26] 13 Report of Proceedings (Oct. 26, 1998) at 15, 20.

[27] Clerk's Papers at 143.

here in Tacoma or Federal Way, Washington the alternatives are not in the child's best interest. In the first alternative the child would be a child of a single parent. That is not in the best interest of a child that could have an opportunity to be brought up by two parents. In the second alternative, the child may have a life of turmoil as the child of divorced parents. Also, both parties here are old enough to be the grandparents of any child, and that is not an ideal circumstance. The court awards the preembryos to Father with orders to use his best efforts for adoption to a two-parent, husband and wife, family outside the State of Washington, considering the egg donor in that, as Father is required.[28]

On December 11, 1998, Judge Stone also issued an order staying the order on preembryos and the restraining order on Petitioner.[29] The order prevented Petitioner from removing or in any way altering the status of the preembryos until final judgments including "any and all appeals" are entered in the action.[30]

On January 7, 1998 the court, under a stipulation, appointed Steve Downing to serve as guardian ad litem for the two preembryos.[31]

In affirming the trial court, the Court of Appeals concluded the contracts signed by Petitioner and Respondent in California did not require Respondent to continue with their family plan to have another child and that Respondent's right not to procreate compelled the court to award the preembryos to him.[32]

On November 16, 2000 Petitioner Becky M. Litowitz sought review by this court[33] which was granted on April 12, 2001.[34]

---

[28] *Id.* at 143. The characterization of frozen preembryos as "children" is of dubious legal or scientific correctness. However, it is of no consequence to our determination in this case.

[29] *Id.* at 197.

[30] *Id.*

[31] *Id.* at 148.

[32] *Litowitz*, 102 Wn. App. at 946.

[33] Pet. for Review, Wash. Supreme Ct. (Nov. 16, 2001).

[34] Order, Wash. Supreme Ct. (Apr. 12, 2001).

On May 8, 2001 Respondent David J. Litowitz filed a motion to allow additional evidence on review.[35] He indicated the evidence related to: (1) Petitioner Litowitz' drug use discovered after the final decree of dissolution and parenting plan which resulted in modification of the parenting plan designating Respondent as the primary residential parent for M.; and (2) a report that Petitioner attempted to murder Respondent by paying a third party to have him killed.[36] Respondent asked this court to remand this matter to the trial court for testimony on the suitability of Petitioner to be a parent.[37] In the alternative, he asked this court to consider affidavits filed in the Pierce County Superior Court in the child custody modification action.[38]

## DISCUSSION

### CONTRACTUAL ISSUES

This is the first case in which this court has been asked to resolve a dispute over disposition of frozen preembryos in a dissolution action. There is limited case law in other jurisdictions involving disputes over disposition of frozen preembryos. We have identified cases addressing the issue from the highest courts of Tennessee, Massachusetts, New York and New Jersey.

In *Davis v. Davis* the Tennessee Supreme Court laid a framework for deciding disputes between divorcing couples over frozen preembryos.[39] The court stated that

disputes involving the disposition of preembryos produced by

---

[35] Mot. to Allow Additional Evidence on Review, Wash. Supreme Ct. (May 8, 2001).

[36] *Id.* at 1-2.

[37] *Id.*

[38] *Id.* at 2.

[39] *Davis v. Davis*, 842 S.W.2d 588, 597 (Tenn. 1992).

*in vitro* fertilization should be resolved, first, by looking to the preferences of the progenitors. If their wishes cannot be ascertained, or if there is dispute, then their prior agreement concerning disposition should be carried out. If no prior agreement exists, then the relative interests of the parties in using or not using the preembryos must be weighed.[40]

In that case both parties were progenitors.[41] The woman provided the eggs and the man provided the sperm.[42] One party wished to donate the preembryos to another couple and the other wished to discard them.[43] The court balanced the relative interests of the parties, even though they had not signed an agreement, and found in favor of the party wishing to discard the preembryos.[44]

In *Kass v. Kass* the New York Court of Appeals concluded the parties' agreement to donate preembryos to an *in vitro* fertilization program for research purposes would control.[45] In that case both parties were progenitors.[46] The woman wanted to implant the pre-zygotes[47] to achieve another pregnancy.[48] The man opposed any pregnancy and counterclaimed for specific performance of the agreement to allow the *in vitro* fertilization program to keep them for research.[49] The parties had signed four consent agreements provided by the hospital.[50] The significant one provided in part:

---

[40] *Id.* at 604.

[41] STEDMAN'S MEDICAL DICTIONARY 1434 (26th ed. 1995) (A "progenitor" is "[a] precursor, ancestor; one who begets.").

[42] *Davis*, 842 S.W.2d at 591-92.

[43] *Id.* at 590.

[44] *Id.* at 603-05.

[45] *Kass v. Kass*, 91 N.Y.2d 554, 562, 569, 696 N.E.2d 174, 673 N.Y.S.2d 350 (1998).

[46] *Kass*, 91 N.Y.2d at 560.

[47] The terms "preembryo" and "pre-zygotes," while technically not the same, are used interchangeably in the cases.

[48] *Id.* at 560.

[49] *Id.*

[50] *Id.* at 558.

" 'In the event of divorce, we understand that legal ownership of any stored pre-zygotes[51] must be determined in a property settlement and will be released as directed by order of a court of competent jurisdiction. Should we for any reason no longer wish to attempt to initiate a pregnancy, we understand that we may determine the disposition of our frozen pre-zygotes remaining in storage. . . .

" 'The possibility of our death or any other unforeseen circumstances that may result in neither of us being able to determine the disposition of any stored frozen pre-zygotes requires that we now indicate our wishes. . . .' " [52]

The couple indicated that, in the event they no longer wished to initiate a pregnancy or if they were unable to make a decision regarding disposition of their frozen pre-zygotes, the clinic could use the pre-zygotes for research and then dispose of them.[53] The court found the consent agreement manifested the party's intent and concluded the pre-zygotes must be donated to the clinic.[54]

In *A.Z. v. B.Z.*, the Massachusetts Supreme Court determined a consent agreement, providing that upon the donors' separation the preembryos would be given to one of the donors for implantation, would not be enforced under the facts of the case.[55] The court concluded the contract was intended only to define the donors' relationship with the clinic; it did not contain a duration provision; it did not represent the true intention of the parties for disposition of the preembryos; and it was against public policy to compel a person to be a parent against that person's will.[56]

Petitioner Becky M. Litowitz claims she has a contractual right to the cryopreserved preembryos in this case and that the Court of Appeals erred when it ignored her contractual

---

[51] The court defined "pre-zygote" as " 'eggs which have been penetrated by sperm but have not yet joined genetic material.' " *Kass*, 91 N.Y.2d at 557 n.1.

[52] *Id.* at 559.

[53] *Id.* at 559-60.

[54] *Id.* at 569.

[55] *A.Z. v. B.Z.*, 431 Mass. 150, 158, 725 N.E.2d 1051 (2000).

[56] *A.Z.*, 431 Mass. at 157-62.

right to them.[57] She maintains the egg donor contract gives her and Respondent equal rights to the preembryos.[58] She argues that a biological relationship should not be the only factor used in determining whether she has a right to them.[59]

Respondent David J. Litowitz argues the egg donor contract does not provide for disposition of the preembryos to Petitioner.[60] He claims there was no specific provision in that contract relating to disposition of the preembryos or disposition in the event of divorce.[61]

The Court of Appeals concluded there was no express agreement to enforce because under the cryopreservation contract Petitioner and Respondent are required to petition the court for instructions only in the event they could not reach a mutual decision concerning disposition of the preembryos.[62]

The Tennessee Supreme Court has wisely observed that disputes involving disposition of preembryos produced by *in vitro* fertilization should be resolved by looking to the preferences of the progenitors.[63] That court stated that "[i]f their wishes cannot be ascertained, or if there is dispute, then their prior agreement concerning disposition should be carried out."[64]

The Massachusetts Supreme Court offers common-sense advice that agreements regarding disposition of preembryos should be presumed valid and binding, and

---

[57] Pet. for Review at 4.

[58] *Id.*

[59] *Id.* at 5.

[60] Answer to Pet. for Review at 9.

[61] *Id.* at 6-7.

[62] *Litowitz*, 102 Wn. App. at 941.

[63] *Davis*, 842 S.W.2d at 604.

[64] *Id.*

enforced in any dispute;[65] and that before embarking on *in vitro* fertilization and cryopreservation, the parties should think through possible contingencies and specify their wishes in writing.[66] That court stated that "[a]dvance directives, subject to mutual change of mind that must be jointly expressed, both minimize misunderstandings and maximize procreative liberty by reserving to the progenitors the authority to make what is in the first instance a quintessentially personal, private decision."[67]

In *J.B. v. M.B.* the New Jersey Supreme Court recently decided a case in which the woman, J.B., wished to discard remaining preembryos and the man, M.B., wished to implant them or donate them to infertile couples.[68] J.B. and M.B. signed a consent form providing that the couple would relinquish their control to the In Vitro Fertilization Program in the event of a "dissolution of [their] marriage by court order, unless the court specifies who takes control and direction of the tissues."[69] The Court held that when one party has reconsidered that party's prior decision, the interests of both parties must be evaluated.[70] The court indicated that since M.B. is capable of fathering additional children and J.B. has the right to prevent implantation of the preembryos, the remaining preembryos should be destroyed.[71]

█ This case involves a dispute over frozen preembryos between Petitioner, who is not a progenitor, and Respondent, who is a progenitor. In the four cases cited from Tennessee, Massachusetts, New York and New Jersey, one party to each dispute contributed the egg and the other party contributed the sperm. They were all progenitors. In

---

[65] *See Kass*, 91 N.Y.2d at 565; *see Davis*, 842 S.W.2d at 597.

[66] *Id.*

[67] *Id.*

[68] *J.B. v. M.B.*, 170 N.J. 9, 783 A.2d 707 (2001).

[69] *Id.* at 14.

[70] *Id.* at 30.

[71] *Id.*

this case Petitioner did not produce the eggs used to create the preembryos. She has no biological connection to the preembryos and is not a progenitor. Any right she may have to the preembryos must be based solely upon contract.

The egg donor contract provides:

> All eggs produced by the Egg Donor pursuant to this Agreement shall be deemed *the property of the Intended Parents and as such, the Intended Parents shall have the sole right to determine the disposition of said egg(s).* In no event may the Intended Parents allow any other party the use of said eggs without express *written* permission of the Egg Donor.[72]

(Emphasis added.)

■ Petitioner Becky M. Litowitz correctly asserts that the egg donor contract gives her and Respondent equal rights to the eggs even though she is not a progenitor. The contract defines Petitioner Litowitz as the "Intended Mother" and Respondent David J. Litowitz as the "Natural Father."[73] It defines the "Intended Parents" as the Natural Father and the Intended Mother.[74] The contract provides that the intended parents, Petitioner and Respondent, have a right to determine disposition of the eggs. Even though Respondent Litowitz, as the intended father, indeed has a biological connection to the preembryos, he has no greater contractual right to the eggs than Petitioner Litowitz has as the intended mother. Under that contract, Petitioner and Respondent would have equal rights to the eggs. But the egg donor contract does not relate to the preembyos which resulted from subsequent sperm fertilization of the eggs.

■ It is not correct to conclude, as now asserted by Respondent, that there was no written agreement concerning intervention by the court. The cryopreservation contract provided "in the event [the Litowitzes] are unable to reach a mutual decision regarding the disposition of [their] pre-embryos, they must petition a court of competent juris-

---

[72] Clerk's Papers at 163.

[73] *Id.*

[74] *Id.*

diction for instructions concerning the appropriate disposition of [their] pre-embryos."[75] Petitioner and Respondent agreed to this. Neither questions whether the cryopreservation contract is an enforceable one. Indeed, they both rely upon it in asserting their rights.

It is obvious that Petitioner and Respondent have not reached a mutual decision regarding disposition of the preembryos. Because they have not, it is appropriate for the courts to determine disposition of the preembryos under the cryopreservation contract.

■ "The touchstone of contract interpretation is the parties' intent."[76] Contract interpretation must be based on the intent of the parties as reflected in their agreement.[77] Intent may be discovered not only from actual language in an agreement, but also from " 'viewing the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties.' "[78]

The cryopreservation contract, signed March 25, 1996, provided for disposition of the Litowitzes' two remaining preembryos. They unequivocally chose the option "[t]hat [their] pre-embryos be thawed but not allowed to undergo further development."[79] The contract provided that when the preembryos had been cryopreserved for five years after the initial date of cryopreservation, the "preembryos would be thawed but not allowed to undergo any further development" unless the Litowitzes requested participation for an

---

[75] Answer to Pet. for Review, App. at 14-16.

[76] *Tanner Elec. Coop. v. Puget Sound Power & Light Co.*, 128 Wn.2d 656, 674, 911 P.2d 1301 (1996). *See Scott Galvanizing, Inc, v. N.W. EnviroServices, Inc.*, 120 Wn.2d 573, 580, 844 P.2d 428 (1993).

[77] *Byrne v. Ackerlund*, 108 Wn.2d 445, 455, 739 P.2d 1138 (1987).

[78] *Scott Galvanizing*, 120 Wn.2d at 580-81 (quoting *Berg v. Hudesman*, 115 Wn.2d 657, 667, 801 P.2d 222 (1990) (quoting *Stender v. Twin City Foods, Inc.*, 82 Wn.2d 250, 254, 510 P.2d 221 (1973))).

[79] Answer to Pet. for Review, App. at 14-16.

additional period of time and the Center agreed. The record does not indicate the exact date the remaining preembryos were frozen.[80] However, the cryopreservation contract was signed by the Litowitzes on March 25, 1996. More than five years have passed since that date. The probable date of implantation of the three preembryos actually used was April 20, 1996. More than five years have passed since that date. Neither Petitioner nor Respondent claims extension of the contract beyond five years. Under the five-year termination provision of the cryopreservation contract, the Center is directed by the Litowitzes to thaw the preembryos and not allow them to develop any further. There is nothing in the record to indicate whether the two preembryos still exist.

Petitioner claims the decision of the Court of Appeals is internally inconsistent because it held that the contract did not control the dispute between the intended parents while it could be used to extinguish the rights of the egg donor.[81] She asserts the Court of Appeals extinguished the rights of the egg donor when it allowed Respondent the right to transfer the preembryos to a third party without the egg donor's consent as required by the egg donor contract.[82]

Respondent asserts the Court of Appeals did not determine the rights of the egg donor.[83] He maintains the court chose not to determine the egg donor's rights under the

---

[80] The court can take judicial notice that cryopreservation occurred on the date the other three preembryos were implanted which resulted in the birth of M. on January 25, 1997. Under a normal gestation period of 280 days, the date of implantation was most probably April 20, 1996.

See Sidney B. Schatkin, DISPUTED PATERNITY PROCEEDINGS 519-20 (Matthew Bender & Co., Inc. 1953) (1944) ("The duration of pregnancy, or period of gestation, is the interval in days between the time of impregnation and the beginning of labor. The normal period of gestation, according to the consensus of medical testimony, is approximately 9 calendar months—10 lunar months—or 280 days, calculated from cessation of the last menstruation. In the United States, the courts will judicially notice that a period of 9 calendar months is the usual period of gestation." (footnote omitted)).

[81] Pet. for Review at 8.

[82] Id. at 8-13.

[83] Answer to Pet. for Review at 9.

contract because he had not sought transfer of the preembryos under terms of that contract, but based his claim only upon the cryopreservation contract.[84] Respondent points out that the egg donor has not been a party at any stage in this litigation and no issues relating to any rights the egg donor might have to the preembryos have been brought before the court.[85]

The Court of Appeals correctly concluded the egg donor contract, at any rate, did not prevent Respondent from donating the preembryos to another couple.[86] The court indicated Respondent would not need written permission from the egg donor to donate the preembryos because the egg donor contract required written permission only for transfer of the donated eggs. The court correctly observed that the eggs no longer existed as they were identified in the egg donor contract because they were later fertilized by Respondent's sperm and their character was then changed to preembryos.[87] The Court of Appeals did not rule on the rights of the egg donor under the egg donor contract because that matter has not been before the court at any stage of these proceedings. Even if it were, it is doubtful that the egg donor would have a remaining contractual right once the eggs have been fertilized and become preembryos.

Petitioner Becky M. Litowitz argues the term "child," rather than "pre-embryo," is the correct term and concept for the court's consideration in this case.[88] She also claims she has a constitutional right to custody and companionship of a child.[89] Despite the questionable characterization by the trial court of the preembryos as a "child," whether a preembryo is a "child" is not a logical or relevant inquiry

---

[84] *Id.* at 10.

[85] *Id.* at 12.

[86] *Litowitz*, 102 Wn. App. at 945.

[87] *Id.*

[88] Pet. for Review at 7.

[89] *Id.* at 13-16.

under the record now before this court. Besides, Petitioner has not cited sufficient authority to support her argument.

It is at least possible that the two frozen preembryos have been destroyed under terms of the contract between Petitioner, Respondent and the Loma Linda Center for Fertility and In Vitro Fertilization dated March 25, 1996 and the specific direction of Petitioner and Respondent. However, no factual determination has been made concerning them. If the two preembryos still exist, they would be a proper subject for consideration by the court under the cryopreservation contract. If they have been destroyed, the issue in this case would be moot.[90] But we do not reach that determination under the limited record before us.

## ADDITIONAL EVIDENCE ON REVIEW

■ In his motion to allow additional evidence on review, Respondent David J. Litowitz asked this court to allow additional evidence to be taken in the trial court relating to Petitioner Becky M. Litowitz' drug use discovered after the final decree of dissolution which resulted in a temporary order granting Respondent primary custody of their child, M., and evidence regarding a report that Petitioner Litowitz paid a third party to have Respondent killed.[91] He asked that the evidence be presented upon remand to the trial court to hear testimony on Petitioner Litowitz' suitability to be a parent.[92] He requested that this court, in the alternative, consider affidavits already filed in the Pierce County Superior Court in the child custody modification action.[93] He must satisfy the requirements of RAP 9.11 and particularly subsection (a) which reads:

---

[90] *See Dioxin / Organochlorine Ctr. v. Pollution Control Hearings Bd.*, 131 Wn.2d 345, 350, 932 P.2d 158 (1997); *In re Det. of Swanson*, 115 Wn.2d. 21, 24, 793 P.2d 962 (1990).

[91] Mot. to Allow Additional Evidence on Review at 1-2.

[92] *Id.*

[93] *Id.* at 2, 11.

### ADDITIONAL EVIDENCE ON REVIEW

**(a) Remedy Limited.** The appellate court may direct that additional evidence on the merits of the case be taken before the decision of a case on review if: (1) additional proof of facts is needed to fairly resolve the issues on review, (2) the additional evidence would probably change the decision being reviewed, (3) it is equitable to excuse a party's failure to present the evidence to the trial court, (4) the remedy available to a party through postjudgment motions in the trial court is inadequate or unnecessarily expensive, (5) the appellate court remedy of granting a new trial is inadequate or unnecessarily expensive, and (6) it would be inequitable to decide the case solely on the evidence already taken in the trial court.

Respondent presented no sufficient grounds for this court to consider his request for additional evidence on review. We deny his request.

## *SUMMARY AND CONCLUSIONS*

This case is limited to a determination, in a parenting plan incident to a dissolution action, of the contractual rights of a married couple to two cryopreserved (frozen) preembryos remaining after successful implantation of three preembryos in a surrogate mother which resulted in the birth of a child.

Petitioner Becky M. Litowitz and her then husband, Respondent David J. Litowitz, in Beverly Hills, California on March 20, 21, and April 1, 1996 contracted with J.Y. for donation of eggs from J.Y. by transvaginal aspiration so the eggs "shall be removed from [J.Y.'s] body, fertilized with the semen of the Natural Father [Respondent David J. Litowitz]" by which the "fertilized egg(s)/ovum/zygote shall be implanted into the body of . . . a Surrogate Mother for the purpose of carrying the pregnancy to term." This process produced five eggs which were fertilized under terms of the contract.

Petitioner and Respondent on March 25, 1996 entered into two contracts with the Loma Linda Center for Fertility and In Vitro Fertilization in Loma Linda, California, the

pertinent one of which was designated "a consent and authorization for pre-embryo cryopreservation (freezing) following *in vitro* fertilization," which provided for freezing the preembryos.

Three of the five fertilized eggs, then called preembryos, were implanted in a surrogate mother, producing a child who was born January 25, 1997. The two remaining preembryos were cryopreserved (frozen) and stored in the clinic in Loma Linda, California. It is these two preembryos which are the sole subject of the litigation before the court in this case.

The egg donor contract is not at issue in this case. This court is concerned only with the preembryo cryopreservation contract. Under that contract Petitioner and Respondent agreed to submit to the court the question of disposition of remaining preembryos in the event they could not reach mutual agreement. They could not reach agreement. The matter has thus been presented to the Pierce County Superior Court, the Court of Appeals and now to this court for appropriate instructions.

It is not necessary for this court to engage in a legal, medical or philosophical discussion whether the preembryos in this case are "children," nor whether Petitioner (who was not a biological participant) is a progenitor as is Respondent (who was a biological participant).

We base our decision in this case solely upon the contractual rights of the parties under the preembryo cryopreservation contract with the Loma Linda Center for Fertility and In Vitro Fertilization dated March 25, 1996. Under that contract Petitioner and Respondent gave direction to the Loma Linda Center for disposition of the remaining preembryos resulting from fertilization of five eggs they acquired under the egg donor contract. They directed that the remaining preembryos be "thawed out but not allowed to undergo further development" and disposed of when the preembryos "have been maintained in cryopreservation for five (5) years after the initial date of cryopreservation unless the Center agree[d], at [the Litowitzes'] request, to

extend [their] participation for an additional period of time." The record does not indicate whether the two cryopreserved preembryos are still in existence. Neither Petitioner nor Respondent has requested an extension of their contract with the Loma Linda Center. Under terms of the contract, then, the remaining preembryos would have been thawed out and not allowed to undergo further development five years after the initial date of cryopreservation, which by simplest calculation would have occurred on March 24, 2001.

The first three preembryos were implanted in a surrogate mother, most probably about April 20, 1996 and certainly not before March 25, 1996, with the resultant birth of a child, M., on January 25, 1997. The date of April 20, 1996 is determined by calculating a 280-day gestation period for the child. Custody of the remaining two preembryos was taken by the Loma Linda Center under the cryopreservation contract on the date the other three were implanted in the surrogate mother.

Petitioner David J. Litowitz filed a motion to allow additional evidence on review. He presented no sufficient grounds under the applicable RAP 9.11 for this court to consider his request for additional evidence. We deny his motion.

We reverse the decision of the Court of Appeals, Division Two.

ALEXANDER, C.J., and JOHNSON, IRELAND, BRIDGE, and OWENS, JJ., concur.

MADSEN concurs in the result.

CHAMBERS, J. (concurring in part and dissenting in part). I largely concur with the reasoning of the majority. However, I would remand for further proceedings based on contract principles, equity, and public policy.

The majority grounds its result upon a contract between the parties and Loma Linda Center for Fertility and In Vitro Fertilization in Loma Linda, California. The majority fails, in my view, to emphasize that this contract must be considered in the context of a dissolution action. In a dissolution, principles of equity and public policy must be

considered by the court in construing agreements between the parties regarding their dissolution. *See* RCW 26.09.080; *see also In re Marriage of Matson*, 107 Wn.2d 479, 485, 730 P.2d 668 (1986); *In re Estate of Crawford*, 107 Wn.2d 493, 498, 730 P.2d 675 (1986). Subject to equity and public policy, great weight should be given to the intent of the parties.

I conclude that the intent of the parties, as evidenced by the written contract, is consistent with equity and public policy as expressed by the Legislature and this Court and should be enforced. However, given that the trial court applied a different standard, remand is the appropriate remedy.

SANDERS, J. (dissenting) — The majority contends the cryopreservation contract controls the disposition of the preembryos. Majority at 527. But even if so, I posit that the contractual text does not support the majority's disposition, but rather the trial court's.

The contract states in pertinent part:

> We agree that because both the husband and wife are participants in the cryopreservation program, that any decision regarding the disposition of our pre-embryos will be made by mutual consent. *In the event we are unable to reach a mutual decision regarding the disposition of our pre-embryos, we must petition to a Court of competent jurisdiction for instructions concerning the appropriate disposition of our pre-embryos.*

Pet'r's Ex. 410, at 3 (Cryopreservation Contract) (emphasis added). The contractual provision vested the trial court with exclusive discretion to determine an appropriate disposition of the preembryos upon request but absent the agreement of the parties.

I however posit this provision of the contract is applicable because the parties *were* unable to come to a mutual decision, and *did* petition a court for an appropriate disposition of their preembryos, strictly in accordance with this clause of the contract. In the reasonable exercise of its contractually vested discretion—and the majority does not claim that discretion was abused—the trial court adopted

the "best interests of the child" criterion and awarded the preembryos to David Litowitz. Nevertheless, the majority bases its reversal on the mistaken conclusion that the next clause of the contract dictates a different result. That clause provides:

> We are aware that for a variety of reasons, (e.g. our choice, death of both of us, our achieving our desired family size), one or more pre-embryos may remain frozen and *will not be wanted or needed by us.* By this document, we wish to provide the Center with our mutual direction regarding disposition of our pre-embryos *upon the occurrence of any one of the following four (4) events or dates*:
>
> A. The death of the surviving spouse or in the event of our simultaneous death.
> B. In the event we mutually withdraw our consent for participation in the cryopreservation program.
> C. Our pre-embryos have been maintained in cryopreservation for five (5) years after the initial date of cryopreservation unless the Center agrees, at our request, to extend our participation for an additional period of time.
> D. The Center ceases it's [sic] *in vitro* fertilization and cryopreservation program.
>
> At the earliest of the above-mentioned events or dates, we authorize and request that one of the following options be utilized for the disposition of our pre-embryos remaining in cryopreservation:
>
> . . . .
>
> (3) That our pre-embryos be thawed but not allowed to undergo further development [selected option].

*Id.* (emphasis added); majority at 519-20.

This provision is facially inapplicable because its stated contingencies concern either a *mutual* decision not to produce a child (B, C), the death of both parties (A), or impossibility (D), none of which is present here. Nevertheless, with the unerring precision of a moth to the flame, the majority seizes upon the third contingency, ignoring the mutuality of decision implicit in the phrase "at *our* request." *Id.* (emphasis added).

Its errant reliance on, and misinterpretation of, this provision is further aggravated when the majority gives *no effect* to the previous relevant and operative provision. *See, e.g., McDonald v. State Farm Fire & Cas. Co.*, 119 Wn.2d 724, 734, 837 P.2d 1000 (1992) (courts should interpret the contract in a way that gives effect to each provision). Thus the majority defeats the plain meaning of the first paragraph by divesting the trial court of the authority contractually and exclusively vested in it to resolve disputes of this kind.

Even if one were to apply the second paragraph, carelessly setting aside the former operative provision and ignoring the mutual consent implicit in the third contingency, the contract *still* would not support the majority's outcome because the contractual time period was tolled by the timely commencement of this litigation as a matter of law. *See Wothers v. Farmers Ins. Co. of Wash.*, 101 Wn. App. 75, 79, 5 P.3d 719 (2000). *Cf. Lane v. Wahl*, 101 Wn. App. 878, 6 P.3d 621 (2000) (considering the validity of a 10-year lease even though the record did not indicate whether the lease had been renewed); *CLEAN v. State*, 130 Wn.2d 782, 928 P.2d 1054 (1996) (considering propriety of mandating the Secretary of State to process referendum petition long after 90-day time limit of Const. art. II, § 1(d) to gather signatures had expired).

This contract was signed and the cryopreservation began in the spring of 1996. The dissolution proceeding commenced only two years later and included a timely request that the court provide a timely disposition of the preembryos. The proceeding culminated in a dissolution order dated December 11, 1998. That by today more than five years has passed since the cryopreservation commenced is irrelevant because the judicial action which provided for the disposition of the preembryos was commenced well within the five-year window thereby tolling the contracted period of limitations.

*Kass v. Kass*, 91 N.Y.2d 554, 696 N.E.2d 174, 673 N.Y.S.2d 350 (1998) is illustrative. The dispute there was

not unlike the case at bar, as it concerned the disposition of prezygotes as part of a marriage dissolution proceeding. 696 N.E.2d at 175. During their marriage the couple had obtained in vitro fertilization treatment, as part of which they signed a consent and authorization form on all fours with the one we are asked to interpret here. *See id.* at 175-76. As in our case, the form in *Kass* indicated the couple's prezygotes would be stored for a maximum of five years. *Id.* The form was dated May 12, 1993 and the court's decision was handed down on May 7, 1998. *Id.* at 176. But under our majority's reasoning, the five-year termination provision would have been determinative because the subject of the litigation could have been destroyed before the written decision was even delivered to the parties.

But the *Kass* court wisely did not speciously entertain that scenario, as it was apparently the assumption of all there concerned that, as here, the timely commencement of litigation rendered the five-year termination provision inapplicable. Instead, the court focused on the agreement, evidencing the parties' intent to donate their prezygotes to the clinic for research if they could not agree on another disposition. *Id.* at 176-77, 178.

Here, however, David and Becky Litowitz contracted that if they could not reach an agreement on the disposition of their remaining preembryos they were contractually bound to "petition to a Court of competent jurisdiction for instructions concerning the appropriate disposition of" their preembryos. Pet'r's Ex. 410, at 3. That is exactly what they did, and well within the five-year time frame. Now it is our duty to either enforce the agreement as any other contract or set it aside for some recognized legal reason. *See Eurick v. Pemco Ins. Co.*, 108 Wn.2d 338, 340, 738 P.2d 251 (1987).

To properly enforce this agreement we must ultimately determine the parties' intent at the time they signed the consent and authorization form. Parties' contractual intent is determined objectively by looking to various factors, including (1) the language of the agreement; (2) the agreement as a whole; (3) the context in which the agreement

was entered; (4) the parties' conduct following entry into the agreement; and (5) the reasonableness of the interpretations advocated by the parties. *Scott Galvanizing, Inc. v. N.W. EnviroServices, Inc.*, 120 Wn.2d 573, 580-81, 844 P.2d 428 (1993).

This agreement stated exactly what the parties intended in the event they could not agree on the disposition of their preembryos: let the court decide. Provisions whereby parties agree to resort to resolution by courts or arbitrators in the event of disagreement are routinely enforced. *Cf., e.g., Sullivan v. Great Am. Ins. Co.*, 23 Wn. App. 242, 246, 594 P.2d 454 (1979); *Barnett v. Hicks*, 119 Wn.2d 151, 154, 829 P.2d 1087 (1992); *Wagner v. Peshastin Lumber Co.*, 149 Wash. 328, 336, 270 P. 1032 (1928); *State v. Everett*, 144 Wash. 592, 597, 258 P. 486 (1927).

One thing the parties obviously did not intend was to destroy the whole object of the contract, the preembryos, simply because this litigation was prolonged beyond five years after the initial date of cryopreservation while the parties were patiently waiting for appropriate court "instructions concerning the appropriate disposition of [their] pre-embryos," *nor has either party even argued for that unimagined result.* But the majority's disposition apparently calls for the destruction of unborn human life even when, or if, both contracting parties agreed the preembryos should be brought to fruition as a living child reserving their disagreement over custody for judicial determination. Thus the majority denies these parties that option left by Solomon in lieu of chopping the baby in half. The wisdom of Solomon is nowhere to be found here.

The trial court's decision to strive for a result in the best interest of the potential child was certainly at least one reasonable way to effectuate the intent of the parties. There may have been others, but I cannot fault a trial court that recognized the fundamental purpose and objective of the contract and dealt with the prospect a child would be born, the future of which was of paramount concern and profound

540

responsibility. Even if we were to disagree with the trial court, it was the trial court's discretion to exercise, not ours.

I would therefore affirm the trial court's resolution by ordering David Litowitz to donate the preembryos to a couple suitable to raise the child.

Reconsideration denied September 12, 2002.