751 A.2d 613 (2000)
331 N.J. Super. 223
J.B., Plaintiff-Respondent,
v.
M.B., Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued March 28, 2000.
Decided June 1, 2000.
*614 Eric S. Spevak, Andrew L. Rochester and Richard M. Chiumento, Haddonfield, for defendant-appellant (Adinolfi & Spevak, attorneys; Mr. Rochester, Mr. Chiumento and Sandra E. Yampell, on the briefs).
James Katz, for plaintiff-respondent (Sagot, Jennings & Sigmond, Voorhees, attorneys; Mr. Katz, on the brief).
Lenora M. Lapidus, for amici curiae American Civil Liberties Union of New Jersey Foundation, American Society for Reproductive Medicine, and RESOLVE (Ms. Lapidus and Laura M. Le Winn, Princeton, on the joint brief).
Russell J. Passamano & Associates, for amicus curiae LifeNet, Inc. (Russell J. Passamano, Hackensack, on the brief).
Before Judges D'ANNUNZIO, NEWMAN and FALL.
The opinion of the court was delivered by D'ANNUNZIO, J.A.D.
At issue is the post-divorce disposition of frozen human embryos.[1] The trial court *615 ruled in favor of the wife, who seeks their destruction. The husband wants to preserve them for use, either with a woman with whom he develops a relationship or for donation to an infertile couple. The husband appeals the trial court's grant of summary judgment, and we affirm.
The parties were married in February 1992. Their efforts to have a child were unsuccessful. It was stipulated that their reproductive problems "derived from [the wife's] endometriosis and were due to blockage in one of [her] fallopian tubes." The husband's sperm count was normal, and no infertility problems were attributable to him.
The parties decided to use in vitro fertilization (IVF) in an attempt to conceive and bear a child. To that end they contracted with the Cooper Center for In Vitro Fertilization, P.C. (Cooper). IVF, in simple terms, involves the artificial stimulation of egg production in the female, removal of the eggs and their fertilization in a petri dish by the male's sperm. The fertilized egg is then implanted in the womb. Extra embryos, whose structure does not exceed eight cells, are frozen for future use in the event the initial implantation is unsuccessful. Cooper's consent form describes the procedure:
IVF will be accomplished in a routine fashion: that is, ovulation induction followed by egg recovery, insemination, fertilization, embryo development and embryo transfer of up to three or four embryos in the stimulated cycle. With the couple's consent, any "extra" embryos beyond three or four will be cryopreserved according to our freezing protocol and stored at -196 C. Extra embryos, upon thawing, must meet certain criteria for viability before being considered eligible for transfer. These criteria require that a certain minimum number of cells composing the embryo survive the freeze-thaw process. These extra embryos will be transferred into the woman's uterus in one or more future menstrual cycles for the purpose of establishing a normal pregnancy. The physicians and embryologists on the IVF team will be responsible for determining the appropriate biological conditions and the timing for transfers of cryopreserved embryos. The control and disposition of the embryos belongs to the Patient and her Partner. You will be asked to execute the attached legal statement regarding control and disposition of cryopreserved embryos. The IVF team will not be obligated to proceed with the transfer of any cryopreserved embryos if experience indicates that the risks outweigh the benefits.
During the IVF treatment, the wife became pregnant. Whether it was the result of implantation of an in vitro fertilized embryo or through intercourse is not clear from this record. In any event, the wife delivered a "healthy baby girl" in March 1996. The parties separated on September 20, 1996, and a judgment of divorce was entered on November 6, 1998. It incorporated a property settlement agreement, but reserved "a decision concerning the parties' cryopreserved preembryos/embryos."
Thereafter, the wife moved for summary judgment. She certified that she had agreed to the IVF procedure to establish a family in the context of her marriage:
Defendant and I made the decision to attempt conception through in vitro fertilization treatment. Those decisions were made during a time when defendant and I were married and intended to remain married. Defendant and I planned to raise a family together as a married couple. I endured the in vitro *616 process and agreed to preserve the preembryos for our use in the context of an intact family.
The wife stated that she no longer wanted the embryos implanted in her, did not want defendant to retain them for his own use, and did not want them donated to anyone else.
In his certification, the husband alleged that the wife had agreed to donate unused embryos to infertile couples. He certified that
In fact, the option to donate them to infertile couples was the Plaintiff's idea. She came up with this idea because she knew of other individuals in her work place who were having trouble conceiving.
Certifications by the husband's mother, father and sister corroborated the husband's assertion that the wife had agreed to donate the embryos and had offered them to the husband's childless sister.[2]
The parties signed an agreement with Cooper which anticipated changed circumstances such as divorce. It provided:
I, ________ (Patient) and _________ (Partner)
agree that all control, direction and ownership of our tissues will be relinquished to the IVF Program under the following circumstances:
1. A dissolution of our marriage by court order, unless the court specifies who takes control and direction of the tissues, or
2. In the event of death of both of the above named individuals, or unless provisions are made in a Will, or
3. When the patient is no longer capable of sustaining a normal pregnancy, however, the couple has the right to keep embryos maintained for up to two years before making a decision [regarding a] "host womb" or
4. At any time by our/my election which shall be in writing, or
5. When a patient fails to pay periodic embryo maintenance payment.

[Emphasis added.]
The trial judge determined that the parties engaged in IVF to create their child within the context of their marriage. He noted that they achieved their goal, perhaps through intercourse, and they were no longer married. Therefore, according to the trial judge, the reason for the creation and preservation of embryos no longer applied. The judge also relied on the fact that the husband was capable of fathering children in another relationship.
The trial judge's ruling appears to make a finding of fact inconsistent with the husband's position that the wife had agreed to donate unneeded embryos. The husband's core contention on appeal is that a trial was necessary to establish a record, including the parameters of the parties' understanding regarding disposition of the embryos. The husband also argues that the ruling violated his constitutional rights, including his rights to procreate, to due process and to equal protection of the law.
We are aware of three reported appellate decisions regarding the disposition of cryopreserved embryos. The first in time is Davis v. Davis, 842 S.W.2d 588 (Tenn. 1992), cert. denied, 507 U.S. 911, 113 S.Ct. 1259, 122 L.Ed.2d 657 (1993), involving disposition of seven frozen embryos in the context of a divorce. Initially, Mary Sue Davis sought to use the embryos in an effort to become pregnant. Her former husband, Junior Davis, objected on the ground "that he preferred to leave the embryos in their frozen state until he decided whether or not he wanted to become a parent outside the bounds of marriage." Id. at 589.
The trial court awarded "custody" of the embryos to Mary Sue Davis for implantation. The intermediate appellate court reversed on the ground that Junior Davis had a constitutional right not to beget a child. It vested "`joint control ... and *617 equal voice over their disposition'" to the parties. Ibid.
The Tennessee Supreme Court granted review. It noted that each party had modified their positions. Both had remarried. Mary Sue wanted to donate the embryos to a childless couple; Junior sought their destruction. Id. at 590. The court also noted the absence of a written agreement controlling disposition and the lack of an applicable statute. Ibid.
The Tennessee Supreme Court ruled that "preembryos are not, strictly speaking, either `persons' or `property,' but occupy an interim category that entitles them to special respect because of their potential for human life." Id. at 597. The court concluded that Mary Sue and Junior "have decision-making authority concerning disposition of the preembryos, within the scope of policy set by law." Ibid.
In dictum, the court concluded that any agreement regarding disposition of preembryos "should be presumed valid and should be enforced as between the progenitors." Ibid. As previously indicated, however, the parties had no disposition agreement, and the court refused to decide the case based on principles of implied contract. Id. at 598. The court also rejected the intermediate appellate court's effective grant of veto power to Junior Davis, who theoretically could prevent transfer of the embryos until they were no longer viable. Ibid.
The court recognized that "the right to procreational autonomy is composed of two rights of equal significancethe right to procreate and the right to avoid procreation." Id. at 601. It ruled that "the state's interest in the potential life of these preembryos is not sufficient to justify any infringement upon the freedom of these individuals to make their own decisions as to whether to allow a process to continue that may result in such a dramatic change in their lives as becoming parents." Id. at 602.
Finally, the court resolved the conflict between Mary Sue and Junior through a balancing of interests. The court determined that gestation of the preembryos "would impose unwanted parenthood on [Junior], with all of its possible financial and psychological consequences." Id. at 603. This impact, the court ruled, outweighed the impact on Mary Sue's interest in donating the preembryos. The court concluded that "Mary Sue Davis's interest in donation is not as significant as the interest Junior Davis has in avoiding parenthood. If she were allowed to donate these preembryos, he would face a lifetime of either wondering about his parental status or knowing about his parental status but having no control over it." Id. at 604.
Kass v. Kass, 91 N.Y.2d 554, 673 N.Y.S.2d 350, 696 N.E.2d 174 (1998), also involved post-divorce disposition of a couple's frozen embryos. Previous efforts at IVF failed and the parties divorced. Despite the previous failures, the wife sought to use the embryos for implantation, but the husband objected. The trial court "granted appellant [wife] custody of the pre-zygotes and directed her to exercise her right to implant them within a medically reasonable time." Id. at 177. The trial court reasoned that a female progenitor has "exclusive decisional authority over the fertilized eggs ... just as a pregnant woman has exclusive decisional authority over a nonviable fetus." Ibid.
The Appellate Division reversed. The five-justice panel unanimously recognized that the parties' agreement regarding disposition of unused fertilized eggs should control. Ibid. The panel, however, disagreed regarding the clarity of the parties' disposition agreement. A plurality found that the agreement the parties had signed "unambiguously indicated the parties' desire to donate the pre-zygotes for research purposes if the couple could not reach a joint decision regarding disposition." Ibid.
The Court of Appeals affirmed, holding that the parties'"clearly expressed" intent to donate the embryos for research purposes *618 would be enforced. Id. at 178. The Court of Appeals emphasized the need for agreements between progenitors regarding disposition of unused embryos and held that such agreements "should generally be presumed valid and binding, and enforced in any dispute between them." Id. at 180 (citations omitted).
The most recent appellate decision regarding the disposition of frozen embryos is A.Z. v. B.Z., 431 Mass. 150, 725 N.E.2d 1051 (2000). It involved the familiar pattern of IVF resulting in unused frozen embryos, followed by a divorce. There, however, the 1991 IVF resulted in the birth of twins. Id. at 1053. Moreover, the consent forms, signed by the husband in blank, had been completed by the wife to provide that on the donors' separation the embryos were to be given to the wife for implantation. Id. at 1054. The trial court, at the husband's request, had permanently enjoined the wife "from utilizing" the frozen embryos. Id. at 1054-55.
The Supreme Judicial Court of Massachusetts affirmed. The court determined that the consent form was not binding "[i]n view of the purpose of the form (drafted by and to give assistance to the clinic) and the circumstances of execution." Id. at 1056. One of those circumstances was the husband's execution of the consent forms in blank. The court, therefore, doubted that the form represented the parties' intent in the event of a dispute between them. Id. at 1056-57.
Nevertheless, the court addressed and rejected the enforceability of such an agreement:
With this said, we conclude that, even had the husband and the wife entered into an unambiguous agreement between themselves regarding the disposition of the frozen preembryos, we would not enforce an agreement that would compel one donor to become a parent against his or her will. As a matter of public policy, we conclude that forced procreation is not an area amenable to judicial enforcement. It is well established that courts will not enforce contracts that violate public policy.
[Id. at 1057-58 (citations omitted).]
The court relied on certain Massachusetts statutes and judicial decisions from which it "gleaned" that "agreements to enter into familial relationships (marriage or parenthood) should not be enforced against individuals who subsequently reconsider their decisions." Id. at 1059.
Disputes regarding the disposition of reproductive biological material can arise in a rich variety of contexts and circumstances. In this opinion we address and decide only the case before us involving an attempt to enforce an alleged agreement to use embryos to create a child.
Two fundamental rights of constitutional dimension are the right to procreate and the right not to procreate. Skinner v. Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655, 1660 (1942); Roe v. Wade, 410 U.S. 113, 152-53, 93 S.Ct. 705, 726, 35 L.Ed.2d 147, 176-77 (1973); see Griswold v. Connecticut, 381 U.S. 479, 485-86, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510, 515-16 (1965) (holding that statute outlawing use of contraceptive devices was an unlawful invasion of the privacy of marital relationship); see also Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599, 606 (1982) (noting "this Court's historical recognition that freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment"); Right to Choose v. Byrne, 91 N.J. 287, 306, 450 A.2d 925 (1982) (recognizing that "the choice to terminate a pregnancy or bear a child" is "one of the most intimate decisions in human experience").
In the present case, the wife's right not to become a parent seemingly conflicts with the husband's right to procreate. The conflict, however, is more apparent than real. Recognition and enforcement of the wife's right would not seriously impair the husband's right to procreate. Though *619 his right to procreate using the wife's egg would be terminated, he retains the capacity to father children.
On the other hand, enforcing the husband's right to procreate using the embryos at issue in this case could result in the birth of the wife's biological child. Even if the wife were relieved of the financial and custodial responsibility for her child, the fact that her biological child would exist in an environment controlled by strangers is understandably unacceptable to the wife. Arguably, therefore, enforcement of the alleged contract to create a child would impair the wife's constitutional right not to procreate, whereas permitting destruction of the embryos would not effectively impair the husband's reproductive rights. Therefore, even if we assume that the Fourteenth Amendment applies (see the discussion below regarding state action), we reject the husband's contention that his constitutional rights would be violated by destruction of the embryos. Cf. Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 893-98, 112 S.Ct. 2791, 2828-31, 120 L.Ed.2d 674, 725-28 (1992) (invalidating state's requirement of spousal notice as condition to undergoing an abortion); Planned Parenthood of Central Missouri v. Danforth, 428 U.S. 52, 69, 96 S.Ct. 2831, 2841, 49 L.Ed.2d 788, 805 (1976) (holding that a state cannot constitutionally condition an abortion on the spouse's consent).
In urging affirmance of the judgment below, the wife also relies on her constitutional right of privacy and the right not to procreate. We do not, however, resolve this case on constitutional grounds because it is not clear that judicial enforcement of the alleged private contract would constitute state action under the Fourteenth Amendment. Compare Shelley v. Kraemer, 334 U.S. 1, 19, 68 S.Ct. 836, 845, 92 L.Ed. 1161, 1183 (1948) (holding that state court enforcement of racially restrictive covenants constituted state action in violation of the equal protection clause of the Fourteenth Amendment) and Tulsa Professional Collection Servs., Inc. v. Pope, 485 U.S. 478, 487, 108 S.Ct. 1340, 1346, 99 L.Ed.2d 565, 576-77 (1988) (finding state action in probate court's involvement in administration of Oklahoma's statute requiring decedent's creditors to present claim within two months of publication of notice) and New York Times Co. v. Sullivan, 376 U.S. 254, 265, 84 S.Ct. 710, 718, 11 L.Ed.2d 686, 697-98 (1964) (holding that application by Alabama courts of Alabama rule of law regarding libel constituted state action) with Davis v. Prudential Securities, Inc., 59 F.3d 1186, 1191-92 (11th Cir.1995) (holding that judicial enforcement of arbitration award did not constitute state action triggering due process protection) and American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 51, 119 S.Ct. 977, 986, 143 L.Ed.2d 130, 144 (1999) (holding that private insurer's decision to seek review by private utilization review organization of reasonableness and necessity of medical treatment, though authorized by Pennsylvania workers' compensation statute, did not involve state action to the extent necessary to trigger due process guarantees under Fourteenth Amendment) and Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 157, 98 S.Ct. 1729, 1734, 56 L.Ed.2d 185, 194 (1978) (holding that warehouse company's sale of customer's goods for nonpayment of storage charges did not constitute state action, though authorized by state statute). Moreover, we should not decide constitutional issues unless necessary to dispose of the litigation. See O'Keefe v. Passaic Valley Water Comm'n, 132 N.J. 234, 240, 624 A.2d 578 (1993).
We agree, however, with the reasoning expressed in A.Z., supra, and we conclude that a contract to procreate is contrary to New Jersey public policy and is unenforceable. Our conclusion is not inconsistent with Davis, supra, or Kass, supra, because neither decision enforced a contract to procreate, despite expansive dicta regarding the enforceability of agreements between progenitors.
*620 Although we do not decide this case on constitutional grounds, constitutional principles are a source of public policy. Hennessey v. Coastal Eagle Point Oil Co., 129 N.J. 81, 92-93, 609 A.2d 11 (1992). Thus, reproductive rights of constitutional dimension inform our decision in this case.
In the Matter of Baby M, 109 N.J. 396, 434-44, 537 A.2d 1227 (1988), also provides guidance. There our Supreme Court held that a maternal surrogacy contract was unenforceable as contrary to public policy. The contract required the biological mother, impregnated through artificial insemination, to relinquish her parental rights in favor of the sperm donor and his wife. Though the surrogacy situation in Baby M differs from the present case, there is at least one significant similarity. In the present case, successful use of the frozen embryo by a stranger would result in the impairment, and perhaps termination, of the parental rights of the wife in the resulting offspring. Under New Jersey law, this may not be done without clear and convincing evidence of just cause. New Jersey Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 612, 512 A.2d 438 (1986); see Baby M, supra, 109 N.J. at 425-27, 537 A.2d 1227; see also Santosky v. Kramer, supra. Termination of the wife's parental rights would be achieved initially by compelling her to become a biological parent against her will. Thus, the wife would be forced to bear a double insult to her reproductive rights.
Moreover, in New Jersey, as in Massachusetts, see A.Z., supra, there are restrictions against the enforcement of undertakings to marry, N.J.S.A. 2A:23-1 (abolishing actions for "breach of contract to marry"), and to surrender a child for adoption. See Sees v. Baber, 74 N.J. 201, 377 A.2d 628 (1977) (permitting mother to revoke consent to adoption and physical surrender of her child). Thus, the observation of the Supreme Judicial Court of Massachusetts that "agreements to enter into familial relationships (marriage or parenthood) should not be enforced against individuals who subsequently reconsider their decisions," A.Z., supra, 725 N.E.2d at 1059, is as apposite in New Jersey as it is in Massachusetts.
We affirm the judgment in favor of the wife. We note, however, that the trial court's order merely stated that "[p]ursuant to the Court's written decision ... the Plaintiff's [wife's] Motion for Summary Judgment is granted." It is apparent from the context of the case, each party's posture in the case and the trial court's written opinion, that the court's order requires destruction of the embryos.[3] As modified, the order is affirmed.
NOTES
[1] Preembryo is a medically accurate, if awkward, term for a zygote, or fertilized egg, that has not been implanted in a uterus; the embryo proper develops only after implantation. John A. Robertson, Embryos, Families, and Procreative Liberty: The Legal Structure of the New Reproduction, 59 Cal. L.Rev. 939, 952 n. 45 (1986). "The term `frozen embryos' ... is the term of art denoting cryogenically-preserved preembryos." Jennifer Marigliano Dehmel, To Have or Not to Have: Whose Procreative Rights Prevail in Disputes over Dispositions of Frozen Embryos?, 27 Conn. L.Rev. 1377, 1377 n. 4 (1995).

Preembryo refers to the approximately fourteen-day period of development from fertilization to the time when the embryo implants in the uterine wall and the primitive streak, the precursor to the nervous system, appears. Carl H. Coleman, Procreative Liberty and Contemporaneous Choice: An Inalienable Rights Approach to Frozen Embryo Disputes, 84 Minn. L.Rev. 55, 55 n. 1 and 69 n. 66 (1999). Those who favor the use of the term preembryo emphasize that it is the exception, not the rule, for a single individual to result from any given preembryo. Id. at 55 n. 1. However, other commentators criticize the term as a linguistic tool to advance a point of view. Ibid. We use the term embryo in this opinion only because it is linguistically convenient.
[2] The record indicates that the sister is not interested in using the embryos.
[3] There is nothing in the record to indicate that Cooper will not respect an order requiring destruction of the embryos.