**Randy M. ROMAN, Appellant,**

v.

**Augusta N. ROMAN, Appellee.**

**No. 01–04–00541–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Feb. 9, 2006.

Rehearing Overruled May 18, 2006.

Gregory B. Enos, The Enos Law Firm, P.C., Webster, TX, for Appellant.

Rebecca Lynn Reitz, John F. Gay, Gay & Reitz, P.C., Houston, TX, for Appellee.

Heather Morlang, Michelle Marie Sama-dany–Farme, Kacal, Adams & Law, Houston, TX, for Other.

Panel consists of Justices TAFT, KEYES, and HANKS.

## OPINION

EVELYN V. KEYES, Justice.

In a case of first impression in Texas, appellant, Randy M. Roman, appeals the judgment of the trial court that awarded three frozen embryos [1] to appellee, Augus-

---

1. Although "preembryo" is a medically accurate term for a zygote, or fertilized egg, that has not been implanted in a uterus, we will use the term embryo for linguistic convenience. *See* John A. Robertson, *Embryos, Families, and Procreative Liberty: The Legal Struc-*

ta N. Roman, in the couple's final decree of divorce. In five issues, Randy argues that the trial court (1) failed to declare the rights of the parties pursuant to a contract; (2) erred in awarding the three frozen embryos to Augusta; (3) erred in failing to make findings of fact and conclusions of law concerning constitutional issues; (4) violated his constitutional rights by awarding the frozen embryos to Augusta; and (5) erred in awarding frozen embryos to Augusta when Randy had withdrawn his consent.

We reverse and remand the cause.

## Background

Augusta and Randy married on July 5, 1997. After a few years of marriage, the parties began trying to have children. When the traditional avenues of childbirth proved unsuccessful, the parties tried artificial insemination. Several attempts at artificial insemination likewise proved unsuccessful.

In August 2001, the parties met with Dr. Vicki Schnell, the Medical Director at the Center for Reproductive Medicine (the "Center"). Augusta had laparoscopic surgery and three more attempts at artificial insemination, but was still unsuccessful at getting pregnant.

Dr. Schnell then recommended that the parties try in vitro fertilization ("IVF"). The process of IVF "involves the aspiration of ova or oocytes from the follicles of a woman's ovaries and fertilization of these ova in a laboratory procedure using the husband's or donor's sperm. The resulting [embryos] are transferred to the uterus of the potential mother, whereupon a viable pregnancy may occur. Because the IVF procedure frequently produces more

[embryos] than safely may be transferred at one time, the extra [embryos] may be frozen for future use through a process called cryopreservation." *In the Interest of O.G.M.*, 988 S.W.2d 473, 474 (Tex.App.-Houston [1st Dist.] 1999, pet. dism'd).

On March 27, 2002, the parties signed a number of documents at the Center, including one entitled "Informed Consent for Cryopreservation of Embryos" ("embryo agreement"). In this document, the parties authorized the storage of the embryos in a frozen state until the Center determined that appropriate conditions existed for transfer of the embryos to the woman's uterus and both husband and wife agreed to the transfer. In addition, the parties chose to discard the embryos in case of divorce. The document also contained a provision that allowed the parties to withdraw their consent to the disposition of the embryos and to discontinue their participation in the program.

On April 17, 2002, thirteen eggs were extracted from Augusta. Six of these eggs were successfully fertilized with Randy's sperm, resulting in six embryos. Of the six embryos that were fertilized, only three reached a stage of development to warrant the cryopreservation process. Dr. Schnell scheduled Augusta's implantation for April 20. On the night before the implantation, Randy expressed feelings to Augusta that led him to withdraw his consent to the implantation scheduled for the next day. The next day, the parties told Dr. Schnell that Augusta would not undergo the implantation procedure. A month after they decided to wait, the parties signed an agreement to unfreeze three embryos and implant them. The agreement was contin-

*ture of the New Reproduction,* 59 S. CAL. L.REV. 939, 952 n. 45 (1986). Frozen embryos is "the term of art denoting cryogenically-preserved preembyos." Jennifer Marigliano

Dehmel, *To Have or Not to Have: Whose Procreative Rights Prevail in Disputes over Dispositions of Frozen Embryos?,* 27 CONN. L.REV. 1377 n. 4 (1995).

gent on the parties' obtaining approval from a counselor. That agreement never took effect because Randy and Augusta did not progress through counseling.

On December 10, 2002, Randy filed for divorce and Augusta filed a counterclaim for divorce that included claims for fraud and intentional infliction of emotional distress.[2] The parties reached a final binding agreement during mediation as to the division of the marital property, except for the frozen embryos. At trial, Randy asked the trial court to uphold their written agreement, which specified that the embryos be discarded. Augusta wanted the opportunity to have the embryos implanted so that she could have a biological child.[3] If any children were born from the embryos, Augusta stated that Randy would not have parental rights or responsibilities. The day after the trial ended, the trial court ordered that Augusta take possession of the remaining three embryos. After the trial court awarded the embryos to Augusta, Randy complied with section 160.706(a) of the Texas Family Code, which allows him to seek parental rights to any child born from the embryos. See TEX. FAM. CODE ANN. § 160.706(a) (Vernon 2002).

On March 29, 2004, Randy filed a motion for new trial and a request for findings of fact and conclusions of law regarding the award of the frozen embryos to Augusta.[4] The trial court signed its first set of findings on April 26, 2004. The trial court's pertinent findings of fact provide as follows:

1. Three embryos, now frozen, were created during the marriage using the sperm of Randy Roman and the eggs of Augusta Roman.

2. The parties signed a mediation agreement addressing all issues involving the division of community property except for the three frozen embryos.

3. The three frozen embryos are community property.

The trial court's conclusions of law state:

1. The division of the community property agreed to by Petitioner and Respondent in their mediation agreement and the award to Respondent of the three frozen embryos as set forth in the Modified Final Decree of Divorce is just and right and a fair and equitable division of the community property.

On May 13, 2004, the trial court signed a second and more thorough set of findings submitted by Augusta. The record reflects that Randy never filed a request for additional findings.[5]

The trial court's second set of findings of fact state, in relevant part the following:

13. The Court considered all evidence and testimony in balancing the constitutional rights of both parties in making the award of the three (3) frozen embryos to AUGUSTA N. ROMAN.

14. The Court considered all evidence and testimony regarding documents

---

2. In its modified decree of divorce, the trial court entered a take-nothing judgment on Augusta's fraud and intentional infliction of emotional distress causes of action. Augusta does not appeal the trial court's findings on these issues.

3. Dr. Schnell testified that Augusta has a 10% chance of becoming pregnant if the embryos are transferred to her.

4. Randy asserts that he inadvertently submitted this set of findings of fact and conclusions of law. In two of his issues on appeal (the first and third), Randy asks us to abate the appeal to have the trial court make additional findings of fact and conclusions of law.

5. Randy asserts that he never knew that the trial court signed the first or second set of findings.

the parties signed with the Center of Reproductive Medicine....

The second set of conclusions of law states,

7. The award of three (3) embryos to [Augusta] is part of a just and right division of the community estate having due regard for the constitutional rights of each party.

8. The order for the Center of Reproductive Medicine to surrender the three (3) frozen embryos to [Augusta] is necessary to effect a just and right division of the community estate.

### Analysis

In this case of first impression in Texas, we consider the merits of the trial court's award of frozen embryos to Augusta as part of a "just and right" division of community property in light of the parties' prior written agreement to discard the embryos. We answer the issue with which we are presented as narrowly as possible in anticipation that the issue will ultimately be resolved by the Texas Legislature.[6]

### *Award of Embryos*

In his second issue on appeal, Randy argues that the trial court erred when it awarded the three frozen embryos to Au-

gusta because the award violated the parties' embryo agreement. Randy contends that the agreement clearly provided for disposal of the frozen embryos in the case of divorce and that the trial court erred by not enforcing the agreement. Randy points to the following specific provisions in the embryo agreement:

2. We consent and authorize the embryo(s) to be stored in a frozen state until Dr. Schnell and the IVF Laboratory determine that appropriate conditions exist for transfer of the embryo(s) to the wife's uterus and both husband and wife agree to the transfer.

* * *

10. If we are divorced or either of us files for divorce while any of our frozen embryos are still in the program, we hereby authorize and direct, jointly and individually, that one of the following actions be taken:

The frozen embryo(s) shall be ... Discarded.

Randy argues that these provisions of the embryo agreement allow transfer of the embryos only if both parties agree and that the trial court erred by not enforcing the agreement and ordering the embryos destroyed.[7] Randy also argues that no

---

**6.** At least three states have enacted legislation addressing frozen embryos. *See, e.g.,* FLA. STAT. ANN. § 742.17 (couples must execute written agreement providing for disposition in event of death, divorce or other unforeseen circumstances); N.H.REV.STAT. ANN. §§ 168–B:13–168–B:15, 168–B:18 (couples must undergo medical examinations and counseling; 14–day limit for maintenance of *ex utero* prezygotes); LA.REV.STAT. ANN. §§ 9:121–9:133 (pre-zygote considered "juridical person" that must be implanted); *see also* TEX. FAM.CODE ANN. §§ 160.102(2) (defining assisted reproduction), 160.706 (entitled "Effect of Dissolution of Marriage") (Vernon 2002), § 160.754(e) (Vernon Supp.2005) (stating that parties to gestational agreement must enter

into agreement before the 14th day preceding the transfer of embryos).

**7.** We note that the parties also agreed in the embryo agreement that the frozen embryos would be their "joint property." Section seven of the agreement states,

7. We understand that legal principles and requirements regarding IVF and embryo freezing have not been firmly established. There is presently no state legislation dealing specifically with these issues. We have been advised that each embryo resulting from the fertilization of the wife's oocytes by the husband's sperm shall be the joint property of both partners based on currently accepted principles regarding legal own-

evidence or insufficient evidence supports a finding that the embryo agreement was not enforceable or invalid. Although no Texas case has ruled on whether these types of agreements are enforceable, Randy contends that other jurisdictions have held that similar agreements are enforceable.

Augusta does not dispute that she signed and initialed the embryo agreement. She does dispute, however, the agreement's validity and the interpretation of the agreement. Specifically, Augusta argues that the trial court could have chosen not to enforce the agreement because other state supreme courts have found agreements similar to the one at issue here invalid. Because this issue has not been decided by any court in Texas, we will review the scant case law on the issue.

### Prior cases involving frozen embryos

All but one of the cases surveyed involved an oral or written agreement regarding disposition of frozen embryos. In *Davis v. Davis,* the earliest case, the husband and wife did not have an agreement for the disposition of the embryos. 842 S.W.2d 588, 589 (Tenn.1992), *cert. denied sub nom, Stowe v. Davis,* 507 U.S. 911, 113 S.Ct. 1259, 122 L.Ed.2d 657 (1993). The trial court awarded custody of the frozen embryos to the wife, but the court of appeals reversed on the ground that the husband had a constitutional right not to beget a child. *Id.* at 589. In affirming the judgment of the court of appeals, the Supreme Court of Tennessee ultimately chose to weigh the interests of each party and concluded that the husband's interest in avoiding parenthood was more significant than the wife's interest in donating the embryos to another couple for implantation. *Id.* at 604.

Although the parties did not have an agreement concerning disposition of the frozen embryos, the court discussed the enforceability of a contract in this situation. The court stated, "an agreement regarding disposition of any untransferred preembryos in the event of contingencies (such as the death of one or more of the parties, divorce, financial reversals, or abandonment of the program) should be presumed valid and should be enforced as between the progenitors." *Id.* at 597. The court further stated that,

> [W]e recognize that life is not static, and that human emotions run particularly high when a married couple is attempting to overcome infertility problems. It follows that the parties' initial 'informed consent' to IVF procedures will often not be truly informed because of the near impossibility of anticipating, emotionally and psychologically, all the turns that events may take as the IVF process unfolds. Providing that the initial agreements may later be modified *by agreement* will, we think, protect the parties against some of the risks they face in this regard. But, in the absence of such agreed modification, we conclude that their prior agreements should be considered binding.

*Id.* at 597 (emphasis in original).

In *Kass v. Kass,* prior to implantation, the parties signed a consent form which stated that the frozen embryos would not be released from storage without the written consent of both parties. 91 N.Y.2d 554, 673 N.Y.S.2d 350, 696 N.E.2d 174, 176 (1998). Another part of the consent agree-

---

ership of human sperm and oocytes. We are aware that these regulations may change at any time.

This section acknowledges that Texas laws regarding legal ownership of frozen embryos

could change and that this area of the law continues to develop. Because it is not necessary to the disposition of this appeal, we do not address the parties' characterization of the frozen embryos as "joint property."

ment provided that if the parties could not reach a mutual decision on the frozen embryos, the embryos would be donated to research. *Id.* at 177. Before filing suit, the wife decided that she opposed the destruction of the embryos. *Id.* The trial court awarded custody of the embryos to the wife and directed her to implant them within a medically reasonable time. *Id.* The appellate division reversed. It unanimously agreed that the consent agreement regarding the disposition of unused fertilized eggs should control. *Id.* A two-justice plurality found that the parties' consent agreement indicated their desire to donate the embryos for research purposes if they could not both consent to the embryos' disposition. *Id.*

The highest court of New York affirmed the lower court's holding that the parties' consent agreement should control. The court noted that the parties had expressed their intent that if they could not agree on the embryos' disposition, they would be donated for research purposes. *Id.* at 178. It stated, "[P]arties should be encouraged in advance, before embarking on IVF and cryopreservation, to think through possible contingencies and carefully specify their wishes in writing. Explicit agreements avoid costly litigation in business transactions." *Id.* at 180. The court further stated,

> Advance directives, subject to mutual change of mind that must be jointly expressed, both minimize misunderstandings and maximize procreative liberty by reserving to the progenitors the authority to make what is in the first instance a quintessentially personal, private decision. Written agreements also provide the certainty needed for effective operation of IVF programs.

*Id.*

A New Jersey appellate court, by contrast, rejected an alleged oral agreement to procreate as against public policy. *See J.B. v. M.B.*, 331 N.J.Super. 223, 751 A.2d 613, 615 (2000). In *J.B. v. M.B.*, the husband wanted to preserve the frozen embryos for his use or that of an infertile couple. 751 A.2d at 615. The wife wanted the frozen embryos destroyed, and she did not want her former husband to retain them for his own use or to donate them to anyone else. *Id.* at 616. The trial court ruled in favor of the wife, who wanted the embryos destroyed, because the family unit was no longer intact. *Id.*

The appellate court balanced the wife's right not to become a parent with the husband's right to procreate using the embryos under the Fourteenth Amendment and concluded that the husband's right would not be impaired if the embryos were destroyed because he still would be able to father children. *Id.* at 618–19. Thus, even if the Fourteenth Amendment applied, the court rejected the husband's argument that his constitutional rights would be violated if the embryos were destroyed. *Id.* at 619. The appellate court further held that a contract to procreate is contrary to New Jersey public policy and is unenforceable. *Id.* The court thus affirmed the trial court's order that the frozen embryos be destroyed. *Id.* at 620.

The Supreme Court of New Jersey affirmed, but modified the court of appeals' holding, recognizing "that persuasive reasons exist for enforcing preembryo disposition agreements." *J.B. v. M.B.*, 170 N.J. 9, 783 A.2d 707, 719 (2001). The supreme court held that the parties' consent agreement did not "manifest a clear intent by [the parties] regarding disposition of the preembryos in the event of a dissolution of their marriage." *Id.* at 713 (internal quotations omitted). In reaching its ultimate holding, the court considered the constitutional rights of the parties and stated that, "[w]e will not force [the wife] to become a

biological parent against her will." *Id.* at 717. The court held that it will "enforce agreements entered into at the time in vitro fertilization [has] begun, subject to the right of either party to change his or her mind about disposition up to the point of use or destruction of any stored preembryos." *Id.* at 719. If the parties disagree about disposition because one party has reconsidered their decision, the court stated, "the interests of both parties must be evaluated."[8] *Id.*

In *A.Z. v. B.Z.*, before the eggs were retrieved from the wife, the parties signed consent forms. 431 Mass. 150, 725 N.E.2d 1051, 1053–54 (2000). The wife filled out the form, which stated that if they "[s]hould become separated, [they] both agree[d] to have the embryo(s) ... re-turn[ed] to [the] wife for implant." *Id.* at 1054. The court noted that the husband always signed a blank consent form. *Id.* After the husband signed the consent form, the wife would fill in the disposition and sign the form herself. *Id.*

The trial court permanently enjoined the wife from utilizing the frozen embryos held in cryopreservation. The supreme judicial court stated that "in view of the purpose of the form (drafted by and to give assistance to the clinic) and the circumstances of execution, we are dubious at best that it represents the intent of the husband and the wife regarding disposition of the preembryos in the case of a dispute be-tween them." *Id.* at 1056.

Specifically, the court stated that neither the form nor the record indicated that the parties intended the form to be a binding agreement. *Id.* Instead, the court inter-preted the form only to "define the donors' relationship as a unit with the clinic." *Id.*

In reaching its decision, the court also noted that the consent form did not con-tain a duration provision and that it could not assume that the donors intended their consent form to govern a disposition of frozen preembryos four years after it was executed. *Id.* at 1056–57.

The court also looked to the donors' conduct in connection with the execution of the consent forms and determined that their conduct created doubt that the con-sent form represented the intentions of both donors. *Id.* at 1057. Because the husband signed a blank form and the wife later filled in her choice regarding disposi-tion of the frozen embryos, the court con-cluded that the consent form did not rep-resent the true intentions of the husband. *Id.*

In *Litowitz v. Litowitz*, the husband and wife contracted with an egg donor and an IVF clinic. *See* 146 Wash.2d 514, 48 P.3d 261, 263 (2002), *cert. denied*, 537 U.S. 1191, 123 S.Ct. 1271, 154 L.Ed.2d 1025 (2003). After the husband's sperm fertilized three of the donor's eggs, the eggs were implant-ed, resulting in the birth of a child. Be-fore the birth, however, the parties sepa-rated, and sued for divorce. At trial, the wife asked to be awarded the remaining embryos to implant in a surrogate. The trial court awarded the embryos to the husband, who wanted to donate them to an out-of-state couple. The appeals court, in reviewing the egg donor contract, noted that it did not provide what would be done with the embryos if the parties could not agree or if they dissolved their marriage. The court concluded that the husband's right not to procreate compelled an award of the embryos to him. *Id.* at 265. The Supreme Court of Washington reversed,

---

8. The court also stated, "We express no opin-ion in respect of a case in which a party who has become infertile seeks use of stored preembryos against the wishes of his or her partner, noting only that the possibility of adoption also may be a consideration, among others, in the court's assessment." 783 A.2d at 720.

holding the parties to their preembryo cryopreservation contract, which provided that the remaining embryos would be thawed out, but not allowed to undergo further development, and that they would be disposed of after they had been maintained in cryopreservation for five years. *Id.* at 271.

The most recent case to consider the issue, *In re Marriage of Witten*, 672 N.W.2d 768, 771–72 (Iowa 2003), likewise focused on the embryo agreement. In *Witten*, the parties signed an embryo storage agreement with the IVF clinic prior to undergoing the IVF process. *Id.* at 772. The consent form provided that frozen embryos would be released only with the approval of both the husband and the wife. *Id.* The trial court concluded that the embryo storage agreement governed the dispute over the frozen embryos. *Id.* at 773. The parties were thus enjoined from taking any actions with the embryos unless both parties consented. *Id.*

The Iowa Supreme Court noted that the embryo agreement did not specifically address what would happen to the embryos upon divorce. *Id.* The court reviewed the three approaches that courts have used in resolving these types of disputes [9] and adopted the contemporaneous mutual consent model. *Id.* at 783. In adopting this model, the court found that it would be against Iowa public policy "to enforce a prior agreement between the parties in this highly personal area of reproductive choice when one of the parties has changed his or her mind concerning the disposition or use of the embryos." [10] *Id.* at 781. Nevertheless, the court recognized that an embryo agreement between embryo donor

and fertility clinics "serves an important purpose . . . ensuring that all parties understand their respective rights and obligations." *Id.* Given these different considerations, the court stated, "[W]e reject the contractual approach and hold that agreements entered into at the time in vitro fertilization is commenced are enforceable and binding on the parties, 'subject to the right of either party to change his or her mind about disposition up to the point of use or destruction of any stored embryo,'" providing that any change of intention is communicated in writing to all parties. *Id.* at 782–83 (quoting *J.B.*, 783 A.2d at 719). Because the agreement did not address disposition of the embryos upon divorce and neither party could agree on the embryos' disposition, the court enjoined both parties from utilizing the embryos without the other's written consent. *Id.* at 783.

We are mindful of the cases that have addressed this issue and particularly what we see as an emerging majority view that written embryo agreements between embryo donors and fertility clinics to which all parties have consented are valid and enforceable so long as the parties have the opportunity to withdraw their consent to the terms of the agreement. Because we are not bound by state law from other jurisdictions, however, we will also review our own statutes to determine the public policy of this State in the context of embryo agreements.

### Public Policy of Texas

Currently, the State of Texas has laws regarding children of assisted reproduction and gestational agreements, both con-

---

9. The Iowa court stated that courts have used the following approaches to determine the disposition of frozen embryos: (1) a best interest test, (2) a contractual approach, and (3) a contemporaneous mutual consent model.

10. The court concluded that embryos are "fundamentally distinct from the chattels, real estate, and money that are the subjects of antenuptial agreements." *Id.* at 781.

tained within the Uniform Parentage Act.[11] *See* TEX. FAM.CODE ANN. § 160.701–.707 (Vernon 2002), §§ 160.751–.763 (Vernon Supp.2005). Assisted reproduction means a method of causing pregnancy other than sexual intercourse, including IVF and transfer of embryos. *Id.* § 160.102(2)(D) (Vernon 2002). The statute requires that both husband and wife consent to assisted reproduction. *Id.* § 160.704(a). However, section 160.704(b) acknowledges that a child may be born without the husband's consent. *Id.* § 160.704(b). Section 160.706 addresses paternity in the event of divorce as follows: "if a marriage is dissolved before the placement of eggs, sperm, or embryos, the former spouse is not a parent of the resulting child unless the former spouse consented in a record that if assisted reproduction were to occur after a divorce the former spouse would be a parent of the child." *Id.* § 160.706(a). This section also provides that consent of the former spouse may be withdrawn at any time before the placement of eggs, sperm, or embryos. *Id.* § 160.706(b). Noticeably absent from these sections is any legislative directive on how to determine the disposition of the embryos in case of a contingency such as death or divorce. Nor is there anything in the case law that is incompatible with the recognition of the parties' agreement as controlling.

We also look to new legislation concerning gestational agreements. A gestational agreement is an agreement between a woman and the intended parents of a child in which the woman relinquishes all rights as a parent of a child conceived by means of assisted reproduction and which provides that the intended parents become the parents of the child. *See id.* § 160.752(a) (Vernon Supp.2005). The statute specifically authorizes a gestational mother, her husband if she is married, each donor, and each intended parent to enter into a written agreement that relinquishes all parental rights of the gestational mother and provides that the intended parents become the parents of the child. *See id.* § 160.754(a). The statute also requires that the parties to a gestational agreement must enter into the agreement before the 14th day preceding the date of transfer of eggs, sperm, or embryos to the gestational mother. *See id.* § 160.754(e).[12] Parental rights are transferred when a court validates the gestational agreement. *See id.* § 160.753(a), (b). To validate a gestational agreement, the court must find, in relevance to our issue, that each party to the agreement voluntarily entered into and understood the terms of the agreement. *Id.* § 160.756(b)(4). The statute also provides that "[b]efore a prospective gestational mother becomes pregnant by means of assisted reproduction, the prospective gestational mother, her husband if she is married, or either intended parent may terminate a gestational agreement. . . ." *Id.* § 160.759(a).[13]

■ We glean from these statutes that the public policy of this State would permit a husband and wife to enter voluntarily into an agreement, before implantation, that would provide for an embryo's disposition in the event of a contingency, such

---

11. The Uniform Parentage Act became effective on June 14, 2001. *See* TEX. FAM.CODE ANN. §§ 160.001–.763 (Vernon 2002 & Supp.2005). The act governs every determination of parentage in Texas. *See id.* § 160.103(a) (Vernon 2002).

12. Section (g) of this section provides that a gestational agreement may not limit the right of the gestational mother to make decisions to safeguard her health or the health of an embryo. *See* TEX. FAM.CODE ANN. § 160.754(g) (Vernon Supp.2005).

13. If the gestational mother terminates the gestational agreement, she is not liable to the intended parents. TEX. FAM.CODE ANN. § 160.759(d) (Vernon Supp.2005).

as divorce, death, or changed circumstances. We agree with the New York Court of Appeals that "[a]dvance directives, subject to mutual change of mind that must be jointly expressed, both minimize misunderstandings and maximize procreative liberty by reserving to the progenitors the authority to make what is in the first instance a quintessentially personal, private decision." *Kass*, 673 N.Y.S.2d 350, 696 N.E.2d at 180. These agreements should thus be "presumed valid and should be enforced as between the progenitors." *Davis*, 842 S.W.2d at 597; *Kass*, 673 N.Y.S.2d 350, 696 N.E.2d at 180–181.

We believe that allowing the parties voluntarily to decide the disposition of frozen embryos in advance of cryopreservation, subject to mutual change of mind, jointly expressed, best serves the existing public policy of this State and the interests of the parties. We hold, therefore, that an embryo agreement that satisfies these criteria does not violate the public policy of the State of Texas.

We now determine whether the embryo agreement in this case manifests a voluntary unchanged mutual intention of the parties regarding disposition of the embryos upon divorce.

### Embryo Agreement

■ Absent ambiguity, we interpret a contract as a matter of law. *DeWitt County Elec. Co-op., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex.1999). "Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered." *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex.1996). "If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983). "An ambiguity exists only if the contract language is susceptible to two or more reasonable interpretations." *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex.2003). The language in a contract is to be given its plain grammatical meaning unless doing so would defeat the parties' intent. *DeWitt County Elec. Coop.*, 1 S.W.3d at 101. We presume that the parties intended every clause to have an effect. *Heritage Res., Inc. v. Nations-Bank*, 939 S.W.2d 118, 121 (Tex.1996).

■ The following elements are required for the formation of a valid and binding contract: 1) an offer, 2) acceptance in strict compliance with the terms of the offer, 3) a meeting of the minds, 4) each party's consent to the terms, and 5) execution and delivery of the contract with the intent that it be mutual and binding. *Wal–Mart Stores, Inc. v. Lopez*, 93 S.W.3d 548, 555–56 (Tex. App.-Houston [14th Dist.] 2002, no pet.). Consideration is also a fundamental element of every valid contract.[14] *Turner–Bass Assocs. of Tyler v. Williamson*, 932 S.W.2d 219, 222 (Tex. App.-Tyler 1996, writ denied).

The evidence shows that the parties came to the Center on March 27, 2002 to sign a variety of forms. The parties received a cover page along with nine forms.[15] The cover page stated, "Many

14. At least one commentator has suggested that the consideration in embryo agreements is the gamete donation process that both husband and wife experience. Marysol Rosado, *Sign on the Dotted Line: Enforceability of Signed Agreements, upon Divorce of the Married Couple, Concerning the Disposition of Their Frozen Preembryos*, 36 NEW ENG. L.REV. 1041, 1069 (2002).

15. The forms include: Informed Consent for Use of Oral Contraceptives, Informed Consent

forms require careful thought regarding decisions you and your spouse will be asked to make." We focus our discussion on one of the documents entitled, "Informed Consent for Cryopreservation of Embryo."[16]

On page two, under the sub-heading "Consent for Cryopreservation," the document states,

1. We, Augusta Roman (wife) and Randy Roman (husband), the undersigned, hereby authorize and consent to the freezing of some or all of the remaining embryos that result from our participating in the IVF process.

2. We consent and authorize the embryo(s) to be stored in a frozen state until Dr. Schnell and the IVF Laboratory determine that appropriate conditions exist for transfer of the embryo(s) to the wife's uterus and both husband and wife agree to the transfer.

On page three, the document states,

7. We understand that legal principles and requirements regarding IVF and embryo freezing have not been firmly established. There is presently no state legislation dealing specifically with these issues. We have been advised that each embryo resulting from the fertilization of the wife's oocytes by the husband's sperm shall be the joint property of both partners based on currently accepted principles regarding legal ownership of human sperm and oocytes. We are

aware that these regulations may change at any time.

8. We hereby authorize and require that the actions we have marked below be taken if either or both of us should die while any of our frozen embryos are still in possession of the Center of Reproductive Medicine IVF Program. We consent to the following: If only one of us survives, the surviving spouse shall have full authority to decide what is to be done with the embryo(s).

9. We understand that if both of us die, the frozen embryo(s) will be discarded.

On page four, the document states,

10. If we are divorced or either of us files for divorce while any of our frozen embryos are still in the program, we hereby authorize and direct, jointly and individually, that one of the following actions be taken:

The frozen embryo(s) shall be . . . Discarded.[17]

11. If other circumstances arise whereby embryos remain which are not used for the purpose of attempting to initiate a pregnancy in the wife or if the husband and wife are not able to agree on disposition of remaining embryos for any reason, we hereby authorize and direct that the unused frozen embryo(s) will be discarded.

On page five, the document states,

16. We agree and acknowledge that we are voluntary participants, but we understand that we are free to withdraw

---

for Intracytoplasmic Sperm Injection, Request for and Consent for Anesthesia, Informed Consent for Cryopreservation of Embryos, IVF Clinical Contract, Pre–Pay IVF Contract, Informed Consent for the Use of Estrace and Progesterone in IVF, In Vitro Fertilization and Embryo Transfer Informed Consent, and Informed Consent for Assisted Hatching.

**16.** Page 1 of the agreement provides that after the embryos are cryopreserved they will be maintained for up to three years, unless the decision to thaw them sooner is made or cryopreservation is terminated. Neither party relies on this section of the agreement.

**17.** The embryo agreement also gave the parties the option of releasing the frozen embryos to either Randy or Augusta, which they declined.

our consent as to the disposition of our embryo(s) and to discontinue participation by requesting relocation of our embryo(s) to another suitable location at any time without prejudice.

20. Our questions regarding these procedures have been answered to our satisfaction. Our participation is voluntary. We understand that we may withdraw our consent at any time prior to the procedure. We have read and understand this form. We have received a copy of this form.

■ Neither party disputes that he or she signed the agreement or initialed the bottom of each page of this agreement. They also do not dispute that each one of them specifically initialed section 8 (embryo disposition in the event of a death) and section 10 (embryo disposition in the event of divorce). They also do not dispute that their frozen embryos were still in the program or that, when they filed for divorce, they had not withdrawn consent as to the disposition of the embryos and discontinued in the participation in the program.

Rather, Augusta argues that she understood the embryo agreement to apply to remaining embryos only after implantation had occurred. She testified that she never agreed to destroy all the embryos without an opportunity to get pregnant. Although she does not refer specifically to it in her brief, Augusta is apparently relying on the first section of the embryo agreement, entitled *Consent for Cryopreservation.* This section provides, "[The parties] hereby authorize and consent to the freezing of some or all of the remaining embryos that result from our participation in the IVF process." We disagree with Augusta's interpretation of the embryo agreement.

■ For this Court to follow Augusta's interpretation, we would necessarily have to impute language to the contract that is not present and disregard language that is. Specifically, Augusta would have us read the clause as stating that "the parties hereby authorize and consent to the freezing of some or all of the remaining embryos [after an initial set of embryos is implanted] that result from our participating in the IVF process." In an unambiguous contract, we will not imply language, add to language, or interpret it other than pursuant to its plain meaning. *See Schaefer,* 124 S.W.3d at 162; *Natural Gas Clearinghouse v. Midgard Energy Co.,* 113 S.W.3d 400, 407 (Tex.App.-Amarillo 2003, pet. denied).

Section 10 of the agreement specifically states, "If we are divorced or either of us files for divorce while *any of our frozen embryos are still in the program,* we hereby authorize and direct, jointly and individually, that one of the following actions be taken: The frozen embryo(s) shall be ... Discarded." (Emphasis added). Although the parties could have chosen to release the frozen embryos either to Randy or Augusta, they chose the option to discard the frozen embryos in the event of divorce.

The embryo agreement's language could not be clearer. Section 10 specifically addresses the disposition of the frozen embryos in the event of a divorce. It is undisputed that Augusta and Randy both signed the entire embryo agreement, and they both initialed section 10. The evidence shows that the parties considered this section and did not sign it without thought.

Randy testified that before signing the embryo agreement, he and Augusta discussed their options about what would happen to the embryos upon divorce. Randy stated that they were both excited about taking the next step forward, but also nervous. Randy did not notice that Augusta was too emotionally upset to give

consent. He also testified that they did not disagree as what to do in the event of a divorce. He further testified that no coercion, threats, bribery, or promises were used to make them sign the embryo agreement.

Dr. Schnell testified that the purpose of the cryopreservation form was to determine the parties' desires for the disposition of their embryos upon certain events such as divorce or death. Dr. Schnell testified that the couple had chosen to have the embryos discarded in the event that they divorced. On the day the parties signed the consent forms, Dr. Schnell testified that Augusta "was able to participate in the consult, and that she was able to understand the questions that I asked her, and she was able to state that she did initial those and that she understood the consents and that all her questions were answered concerning the process." At that time, Dr. Schnell did not notice any outward signs of an emotional problem that would prevent Augusta from understanding and making an informed consent.

Augusta testified that she would have signed anything to move forward because her goal was to have a child. She testified that it was possible that because she was taking birth control pills she was not in the right mental state to understand the agreement. Augusta further stated that she understood the agreement, "but I wasn't focusing on much on the [inaudible] to the outcome of the whole process of having a child." She also stated that no one was putting any force, coercion or threats on either of the parties to sign the agreement. She understood that one of the options she had been offered was to give the embryos to herself in the event of divorce. Augusta testified that she signed the agreement with the Center. When asked whether she and Randy had had a meeting of their minds as to what would

happen in the unlikely event that they ever divorced, Augusta responded, "We didn't talk about divorce. I mean, it wasn't even a remote—it wasn't a conversation that we had. He signed and I signed—and I initialed it." She was also asked, "So you and Randy Roman never had an agreement on what would happen if you divorce, what would happen to the embryos if you divorced." She responded, "No, we didn't have a discussion." Augusta clarified that they did not have an agreement, other than that expressed in the consent form with the center.

■ "[P]arties strike the deal *they* choose to strike and, thus, voluntarily bind themselves in the manner *they* choose." *Natural Gas*, 113 S.W.3d at 407. Although Augusta's choice may not have been fully considered, the evidence shows that she was aware of and understood the significance of her decision. The parties' embryo agreement clearly indicates their wishes in the event of divorce. We conclude that the parties' embryo agreement was not ambiguous so as to preclude a meeting of the minds.

Our conclusion that section 10 shows a meeting of the minds is bolstered by section 8 of the embryo agreement, which provides that in the event that one or both of the parties should die, they agree to give the embryos to the surviving spouse even though they could have chosen to discard the embryos. The parties' choice to give the surviving spouse full authority over the embryos indicates that the parties were aware of other options in the agreement. The agreement shows that when the parties wanted to discard the embryos, they made that choice. When the parties wanted to give the embryos to one party, they made that choice. In fact, the embryo agreement shows that at some point in signing section 8, Augusta's initials were on the option that would have discarded

the embryos. Her initials were subsequently crossed out and re-entered on the choice giving the surviving spouse full authority for the embryos.

We also note that section 11 is applicable to this dispute. Section 11 states, "[I]f the husband and wife are not able to agree on disposition of remaining embryos for any reason, we hereby authorize and direct that the unused frozen embryo(s) will be discarded." Even without section 10, which clearly provides the course of action in the event of divorce, section 11 would also inform the trial court of what to do in the event of a contingency when the parties could not agree.

 Texas statutory law and section 16 of the embryo agreement allow a party to withdraw consent to assisted reproduction procedures. *See* TEX. FAM.CODE ANN. § 160.706(b) (Vernon 2002) (stating that consent may be withdrawn at any time before the placement of eggs, sperm, or embryos). Neither Randy nor Augusta withdrew consent to the provision in the embryo agreement that the frozen embryos were to be discarded in the event of divorce. Nor did they withdraw consent to the provision within section 11 of the embryo agreement—that if the parties could not agree on the disposition of the embryos, the frozen embryos were to be discarded. Rather, their embryos were still in the program, and the embryo agreement was still in effect when the parties divorced.[18]

Augusta also argues that Randy "breached the intent and purpose of the IVF agreements, thereby invalidating any decisions made by Mrs. Roman based upon her belief that the entire *agreement* would be honored." (Emphasis in original.) Au-

gusta does not cite any argument or authority for this proposition. Therefore, we will not consider it on appeal. *See* TEX. R.APP. P. 38.1(h).

Augusta also argues that the embryo agreement did not reflect a meeting of the minds and was not a valid agreement concerning the disposition of the embryos. She reasons that because Randy deceived her as to his true state of mind, there could be no meeting of the minds. Although there was evidence that Randy had been upset with Augusta in the two years prior to the scheduled implantation, we cannot see how this precludes a meeting of the minds in regard to their mutual decision for the disposition of their embryos in the event of a divorce. *See CU Lloyd's of Texas v. Hatfield*, 126 S.W.3d 679, 682 (Tex.App.-Houston [14th Dist.] 2004, pet. denied) ("If a written contract is so worded that it can be given a definite or certain legal meaning, then it is unambiguous, and [we] may not consider parol evidence as to the parties' intent."). Randy's deceit may have been relevant for proving fraud, but the trial court found against Augusta on that issue.

Augusta additionally argues that because the Center agreed to do whatever the Court ordered it to do, the Center's actions supersede the Center's cryopreservation document and render it moot. Augusta does not state why the embryo agreement is rendered moot, nor does she cite any authority for the proposition. We decline to address her argument. *See* TEX. R.APP. P. 38.1(h).

We hold that the embryo agreement provides that the frozen embryos are to be discarded in the event of divorce. By

---

18. Randy argues in his fifth issue that the trial court erred in awarding the embryos to Augusta after he had withdrawn his consent to their implantation. We note that Randy's withdrawal of consent to implantation of the embryos on April 20, 2002 did not constitute repudiation of the embryo agreement and withdrawal from the program.

awarding the frozen embryos to Augusta, the trial court improperly rewrote the parties' agreement instead of enforcing what the parties had voluntarily decided in the event of divorce. Accordingly, the trial court abused its discretion in not enforcing the embryo agreement.

We sustain Randy's second issue.[19]

Because Randy's second issue is dispositive, we decline to address Randy's remaining issues. *See* TEX.R.APP. P. 47.1.

### Conclusion

We reverse the judgment and remand the cause to the trial court to enter an order consistent with this opinion and with the parties' agreement that the frozen embryos be discarded. All pending motions are denied.

---

19. Because we find that the embryo agreement is unambiguous as a matter of law and that its interpretation is therefore a matter of law for the Court, we do not address Randy's first issue, objecting to the trial court's failure to declare the rights of the parties pursuant to a contract. *See* TEX.R.APP. P. 47.1.